SUSIE MAE WOODSON, ADMINISTRATOR OF THE ESTATE OF THOMAS ALFORD SPROUSE, DECEASED v. NEAL MORRIS ROWLAND; MORRIS ROWLAND UTILITY, INC.; DAVIDSON & JONES, INC.; AND PINNACLE ONE ASSOCIATES, A NORTH CAROLINA PARTNERSHIP

No. 584A88

(Filed 14 August 1991)

1. **Master and Servant § 87 (NCI3d) — workers' compensation — trench cave-in — intentional tort — workers' compensation not exclusive**

The trial court erred in a wrongful death action by granting summary judgment for a subcontractor whose employee was killed when a trench collapsed. When an employer intentionally engages in misconduct knowing it is substantially certain to cause serious injury or death to employees and an employee is injured or killed by that misconduct, that employee, or the personal representative of the estate, may pursue a

civil action against the employer. Such misconduct is tantamount to an intentional tort which is not barred by the exclusivity provisions of the Workers' Compensation Act, and is also the result of an accident under the Act, so that workers' compensation claims may also be pursued, but there may be only one recovery. The substantially certain standard satisfies the Act's purposes of providing trade-offs to competing interests and balancing those interests, while serving as a deterrent to intentional wrongdoing and promoting safety in the workplace. N.C.G.S. § 97-9, N.C.G.S. § 97-10.1.

**Am Jur 2d, Negligence §§ 286-289; Workmen's Compensation §§ 50, 52, 55, 73.**

2. **Master and Servant § 87 (NCI3d)— workers' compensation — trench cave-in—civil action against employer**

The trial court erred in a wrongful death action by granting summary judgment for defendant subcontractor, Morris Rowland Utility, where plaintiff's deceased was an employee of defendant subcontractor; the deceased died when a trench collapsed; plaintiff filed this civil action, then filed a workers' compensation action to meet the filing deadline, but requested that the case not be heard until the completion of this action; the Industrial Commission complied with that request and plaintiff has received no benefits under the Workers' Compensation Act; and the trial court granted all defendants' motions for summary judgment. Morris Rowland's knowledge and prior disregard of dangers associated with trenching; his presence at the site and opportunity to observe the hazards; his direction to proceed without the required safety procedures; Craig's experienced opinion that the trench was unsafe; and Rees' scientific soil analysis all converge to make plaintiff's evidentiary forecast sufficient to survive Rowland Utility's motions for summary judgment.

**Am Jur 2d, Negligence §§ 286-289; Summary Judgment §§ 26, 27; Workmen's Compensation §§ 50, 52, 55, 73.**

3. **Master and Servant § 87 (NCI3d)— workers' compensation — trench cave-in—individual liability of employer**

The trial court erred in a wrongful death action arising from a trench cave-in by granting summary judgment for defendant Morris Rowland in his individual capacity. Morris

WOODSON v. ROWLAND

[329 N.C. 330 (1991)]

Rowland may be held individually liable on the same basis as Rowland Utility.

Am Jur 2d, Corporations §§ 1877, 2166.

4. **Master and Servant § 87 (NCI3d)— workers' compensation— trench cave-in—civil action simultaneously pursued**

A plaintiff in a wrongful death action arising from a trench cave-in could simultaneously pursue her workers' compensation claim because the injury to her intestate was the result of an "accident" as that term is used in the Act. She may elect between these remedies, but is not required to do so, and is in any event entitled to only one recovery.

Am Jur 2d, Workmen's Compensation §§ 50, 52, 55, 73.

5. **Master and Servant § 19 (NCI3d)— trench cave-in—employee of subcontractor killed—liability of contractor**

The trial court erred by granting summary judgment for a contractor in a wrongful death action arising from the death of a subcontractor's employee in a trench cave-in. One who employs an independent contractor to perform an inherently dangerous activity may not delegate to the independent contractor the duty to provide for the safety of others; in determining whether the trenching process which killed plaintiff's decedent was inherently dangerous, the focus is on the particular trench being dug and the pertinent circumstances surrounding the digging. Plaintiff's forecast of evidence was sufficient to survive summary judgment on whether the particular trench in question was inherently dangerous and on whether Davidson & Jones knew of the circumstances.

Am Jur 2d, Independent Contractors §§ 37, 41; Negligence §§ 312 et seq.; Summary Judgment §§ 26, 27.

6. **Master and Servant § 19 (NCI3d)— trench cave-in—employee of subcontractor killed—liability of developer**

The trial court correctly granted summary judgment for the developer, Pinnacle One, in a wrongful death action arising from the death of a subcontractor's employee in a trench cave-in. There is nothing in the forecast of evidence indicating that Pinnacle One or any of its representatives knew or should have known that Davidson & Jones had hired Rowland Utility, knew of the trenching activity in which plaintiff's intestate

WOODSON v. ROWLAND

[329 N.C. 330 (1991)]

was engaged or the dangerous propensities of the particular trench in question, or had any knowledge or expertise regarding safety practices in the construction industry generally or in trenching particularly.

Am Jur 2d, Building and Construction Contracts § 135; Independent Contractors § 24.

7. **Master and Servant § 19 (NCI3d)— trench cave-in—employee of subcontractor killed—liability of contractor for hiring incompetent subcontractor**

The trial court did not err by granting summary judgment for defendant contractor on a claim for negligently selecting and retaining the subcontractor in a wrongful death action arising from the death of an employee of the subcontractor in a trench cave-in. Even if recovery under this theory is available, plaintiff's forecast of evidence was insufficient to survive summary judgment because plaintiff would be unable at trial to establish any lack of due care on the part of the contractor in hiring the subcontractor and, even if what the contractor knew by the end of the day on Saturday, the day before the cave-in, was sufficient to put it on notice that the subcontractor was incompetent or unqualified, it had no reasonable opportunity thereafter to discharge the subcontractor before the trench cave-in occurred.

Am Jur 2d, Building and Construction Contracts § 135; Summary Judgment §§ 26, 27.

Justice MITCHELL concurring in part and dissenting in part.

Justice MEYER joins in this concurring and dissenting opinion.

APPEAL pursuant to N.C.G.S. § 7A-30 from a decision by a divided panel of the Court of Appeals, 92 N.C. App. 38, 373 S.E.2d 674 (1988), affirming summary judgments entered in favor of all defendants by Barnette, J., on 14 September 1987, 16 September 1987, 9 November 1987, and 9 December 1987, in Superior Court, DURHAM County. Plaintiff's petition for discretionary review pursuant to N.C.G.S. § 7A-31 as to issues not addressed in Judge Phillips' dissent was allowed 9 February 1989. Heard in the Supreme Court 12 September 1989.

## WOODSON v. ROWLAND

[329 N.C. 330 (1991)]

*Smith, Patterson, Follin, Curtis, James & Harkavy, by Norman B. Smith and Bryan E. Lessley; and John T. Manning for plaintiff-appellant.*

*Poe, Hoof & Reinhardt, by J. Bruce Hoof; and Poyner & Spruill, by John L. Shaw, for defendant-appellees Neal Morris Rowland and Morris Rowland Utility, Inc.*

*Smith Helms Mulliss & Moore, by J. Donald Cowan, Jr., and L.D. Simmons, II, for defendant-appellee Davidson & Jones, Inc.*

*Patterson, Dilthey, Clay, Cranfill, Sumner & Hartzog, by David H. Batten, for defendant-appellee Pinnacle One Associates.*

EXUM, Chief Justice.

This is a wrongful death action arising from a work-related trench cave-in which killed Thomas Alfred Sprouse on Sunday, 4 August 1985. Plaintiff is the administrator of Sprouse's estate. The principal question is whether the exclusivity provisions of the Workers' Compensation Act limit plaintiff's remedies to those provided by the Act. The courts below concluded plaintiff was so limited in her choice of remedies. We disagree. Other issues in the case concern the viability of certain theories of liability plaintiff asserts: the nondelegability of duties of safety owed to plaintiff's intestate, and the negligent hiring and retention of a subcontractor.

I.

Defendant Pinnacle One Associates ("Pinnacle One") was the developer on a construction project for IBM in Research Triangle Park. It retained defendant Davidson & Jones, Inc. ("Davidson & Jones") as general contractor. One aspect of the project required construction of a sanitary sewer line on Chin Page Road in Durham County. Davidson & Jones hired defendant Morris Rowland Utility, Inc. ("Rowland Utility" or "employer") to dig the line. Defendant Neal Morris Rowland ("Morris Rowland") has at all relevant times been the president and sole shareholder of Rowland Utility. Decedent Thomas Sprouse was Rowland Utility's employee.

On defendants' motions for summary judgment, plaintiff's forecast of evidence tends to show the following:

On Saturday, 3 August 1985, workers from both Rowland Utility and Davidson & Jones were digging trenches to lay sewer lines. The Chin Page Road project required two separate trenches.

Although Rowland Utility was hired to dig both, in the interest of time a Davidson & Jones crew provided men to work in one of the trench sites.

Because the trenches were not sloped, shored, or braced, and did not have a trench box, Lynn Craig, the Davidson & Jones foreman, refused to let his men work in them. The Occupational Safety and Health Act of North Carolina ("OSHANC") and the rules promulgated thereunder required such safety precautions for the trenches in question. N.C.G.S. § 95-136(g); 13 N.C. Admin. Code 7E .1400 *et seq.; cf.* 29 C.F.R. § 1926.650-.653. Because of the soil conditions and geography, Craig believed that a trench box was the best means of ensuring his workers' safety. Morris Rowland procured a trench box for Craig and the Davidson & Jones crew, which commenced work inside the trench after receiving the safety device on the morning of Saturday, 3 August. Morris Rowland did not acquire a trench box for his own crew.

Charles Greene, a member of the Davidson & Jones crew, was operating a backhoe at the Rowland Utility site that Saturday. Craig checked on the site's progress several times. Morris Rowland asked Craig if he could put a Rowland Utility man on the job because he believed that Greene was not operating the backhoe fast enough. Several times Craig denied these requests. Once, Craig operated the machinery himself for a few minutes and concluded that Greene's progress had been adequate. In his deposition, Craig testified that by the end of the day the sides of the Rowland Utility trench were not being adequately sloped, and that it "could have been a little safer." At that point, the trench construction violated OSHANC regulations.[1]

On Sunday, 4 August, the Davidson & Jones crew did not work, and its trench box lay idle. However, the Rowland Utility crew reported to the site to continue digging its trench. A Rowland Utility man, rather than Greene, was now operating the backhoe. Morris Rowland and 'project supervisor, Elmer Fry, discussed whether to use the trench box in their ditch. They decided not to use it, indicating in deposition that they had believed the soil was packed hard enough so the trench would not cave in.

---

1. Rowland Utility had been cited four times in the previous six and a half years for violating regulations governing trenching safety procedures.

**WOODSON v. ROWLAND**

[329 N.C. 330 (1991)]

A backhoe worked in front of decedent Sprouse and his co-workers, who were laying pipe inside the freshly dug trench. A piece of heavy machinery called a front-end loader drove along the edge of the ditch and followed their progress, dumping loads of gravel onto the newly laid pipe. Workers tamped the gravel using a device similar to a jackhammer. Sprouse was the closest person in the trench to the front-end loader.

At about 9:30 a.m. one side of the trench collapsed, completely burying Sprouse and burying the man closest to him up to his armpits. The partially buried man was Alan Fry, son of project supervisor Elmer Fry. The workers pulled Alan Fry out of the trench, and Morris Rowland took him to the hospital.

Morris Rowland did not return to the site for several hours after the cave-in. The remaining workers continued to dig Sprouse out. They refused several offers of help given by Jennifer Spencer, a security guard for another company, who was then on duty and who volunteered to call a rescue squad. By the time the workers had finished digging Sprouse out, he was dead.

The trench was approximately fourteen feet deep and four feet wide with vertical sides at the point of the cave-in. Craig, who saw the site later and commented on a photograph of it at his deposition, stated that the trench was being sloped less than it had been at the end of the previous day's work. He characterized it as "unsafe" and stated that he "would never put a man in it."

Pursuant to N.C.G.S. § 28A-18-2, plaintiff filed civil suits against Rowland Utility; Morris Rowland in his individual capacity; Davidson & Jones; and Pinnacle One Associates. In July 1987, plaintiff filed a Workers' Compensation claim to meet the filing deadline for compensation claims. In order to avoid a judicial ruling that she had elected a workers' compensation remedy inconsistent with the civil remedies she presently seeks, plaintiff specifically requested that the Industrial Commission not hear her case until completion of this action. The Commission has complied with her request, and plaintiff has received no benefits under the Workers' Compensation Act.

In the civil actions before us, the trial court granted all defendants' motions for summary judgment; and the Court of Appeals affirmed, with Judge Phillips concurring in part and dissenting in part. Plaintiff appealed of right on the basis of Judge Phillips'

WOODSON v. ROWLAND

[329 N.C. 330 (1991)]

dissent, and we granted her petition for discretionary review as to additional issues. We now affirm in part and reverse in part.

II.

[1]   We first decide whether the forecast of evidence is sufficient to survive Rowland Utility's and Morris Rowland's motions for summary judgment, which are based on the ground that Sprouse's death was caused only by "accident" under the Workers' Compensation Act ("the Act"). If the death can only be considered accidental, defendants' summary judgment motions were properly allowed because Sprouse's death would fall within the Act's exclusive coverage, and no other remedies than those provided in the Act are available to plaintiff either against his employer, *Hicks v. Guilford County*, 267 N.C. 364, 148 S.E.2d 240 (1966), or a co-worker, *Strickland v. King*, 293 N.C. 731, 239 S.E.2d 243 (1977). On the other hand, if the forecast of evidence is sufficient to show that Sprouse's death was the result of an intentional tort committed by his employer, then summary judgment was improperly allowed on the ground stated, because the employer's intentional tort will support a civil action. *See Pleasant v. Johnson*, 312 N.C. 710, 325 S.E.2d 244 (1985), and cases cited therein.

We conclude, for reasons given below, that the forecast of evidence is sufficient for plaintiff to survive defendants' motions for summary judgment because: (1) it tends to show that Sprouse's death was the result of intentional conduct by his employer which the employer knew was substantially certain to cause serious injury or death; and (2) this conduct is tantamount to an intentional tort committed by the employer. We conclude, further, that plaintiff may pursue simultaneously her workers' compensation claim and her civil action without being required to elect between them because the forecast of evidence tends to show that: (1) Sprouse's death was the result of both an "accident" under the Act and an intentional tort; and (2) the Act's exclusivity provision does not shield the employer from civil liability for an intentional tort. Plaintiff is, of course, entitled to but one recovery.

-A.

Section 97-9 of the Workers' Compensation Act provides:

*Every employer* subject to the compensation provisions of this Article shall secure the payment of compensation to his employees in the manner hereinafter provided; and while such

security remains in force, he or those conducting his business *shall only be liable to any employee for personal injury or death by accident to the extent and manner herein specified.*

N.C.G.S. § 97-9 (1985) (emphasis added).

Section 97-10.1 provides:

If the employee and the employer are subject to and have complied with the provisions of this Article, then *the rights and remedies herein granted to the employee, his dependents, next of kin, or personal representative shall exclude all other rights and remedies of the employee, his dependents, next of kin, or representative as against the employer* at common law or otherwise on account of such injury or death.

N.C.G.S. § 97-10.1 (1985) (emphasis added).

We interpret the Act according to well-established principles of statutory construction. The primary principle is to ensure that the purpose of the legislature is accomplished. *Electric Supply Co. v. Swain Electrical Co.*, 328 N.C. 651, 403 S.E.2d 291 (1991); *Hunt v. Reinsurance Facility*, 302 N.C. 274, 275 S.E.2d 399 (1981). To further this aim, the Court accords words undefined in the statute their plain meaning as long as it is reasonable to do so. *Electric Supply Co.*, 328 N.C. 651, 403 S.E.2d 291; *Burgess v. Your House of Raleigh*, 326 N.C. 205, 388 S.E.2d 134 (1990). Ambiguous or unclear terms are read consistently with overriding legislative purpose. *In re Banks*, 295 N.C. 236, 244 S.E.2d 386 (1978).

The Act seeks to balance competing interests and implement trade-offs between the rights of employees and their employers. It provides for an injured employee's certain and sure recovery without having to prove employer negligence or face affirmative defenses such as contributory negligence and the fellow servant rule. *Pleasant v. Johnson*, 312 N.C. 710, 325 S.E.2d 244. In return the Act limits the amount of recovery available for work-related injuries and removes the employee's right to pursue potentially larger damage awards in civil actions. *Id.* at 712, 325 S.E.2d at 246-47 (citing 1 A. Larson, *The Law of Workmen's Compensation* § 2.20 (1984) ). "[W]hile the employer assumes a new liability without fault he is relieved of the prospect of large damage verdicts." 2A A. Larson *The Law of Workmen's Compensation* § 65.11 (1989) (hereinafter "Larson"). Notwithstanding these important trade-offs, the legislature did not intend to relieve employers of civil liability

## WOODSON v. ROWLAND

[329 N.C. 330 (1991)]

for intentional torts which result in injury or death to employees. In such cases the injury or death is considered to be both by accident, for which the employee or personal representative may pursue a compensation claim under the Act, and the result of an intentional tort, for which a civil action against the employer may be maintained. *See Pleasant v. Johnson,* 312 N.C. 710, 325 S.E.2d 244, and cases cited therein.

In *Pleasant,* which involved co-employee liability for recklessly operating a motor vehicle, we concluded that "injury to another resulting from willful, wanton and reckless negligence should also be treated as an intentional injury for purposes of our Workers' Compensation Act." 312 N.C. at 715, 325 S.E.2d at 248. The *Pleasant* Court expressly refused to consider whether the same rationale would apply to employer misconduct. *Id.* at 717, 325 S.E.2d at 250. Nonetheless, *Pleasant* equated willful, wanton and reckless misconduct with intentional injury for Workers' Compensation purposes.

The plaintiff in *Barrino v. Radiator Specialty Co.,* 315 N.C. 500, 340 S.E.2d 295 (1986), urged us to extend the *Pleasant* rationale to injuries caused by an *employer's* willful and wanton misconduct. The plaintiff, administrator of the estate of the deceased employee, alleged in part that the decedent died as a result of severe burns and other injuries caused by an explosion and fire in the employer's plant. On the employer's motion for summary judgment, the plaintiff's forecast of evidence, which included the allegations of the complaint, tended to show as follows: the employer utilized ignitable concentrations of flammable gasses and volatile flammable liquids at its plant, violated OSHANC regulations in the use of these substances, covered meters and turned off alarms designed to detect and warn of dangerous levels of explosive gasses and vapors—all of which resulted in the explosion and fire which caused the employee's death.

A majority of this Court in *Barrino* refused to extend the *Pleasant* rationale to employer conduct, but only two of the four majority justices expressed the view that the plaintiff's injuries were solely by accident and that the remedies provided by the Act were exclusive. These two justices relied in part on *Freeman v. SCM Corporation,* 311 N.C. 294, 316 S.E.2d 81 (1984), a *per curiam* opinion which concluded that a complaint alleging injuries caused by the willful and wanton negligence of an employer should

be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) of the North Carolina Rules of Civil Procedure because exclusive jurisdiction rested under the Workers' Compensation Act with the Industrial Commission.

The other two justices in the *Barrino* majority concurred on the ground that the plaintiff, having accepted workers' compensation benefits, was thereby barred from bringing a civil suit. *Barrino*, 315 N.C. at 514-15, 340 S.E.2d at 304 (Billings, J., concurring).

The three remaining justices dissented on the ground that the plaintiff's forecast of evidence was sufficient to raise a genuine issue of material fact as to whether the defendant-employer's conduct "embodies a degree of culpability beyond negligence" so as to allow the plaintiff to maintain a civil action. *Id.* at 521, 340 S.E.2d at 307 (Martin, J., dissenting). Believing the plaintiff's forecast of evidence was sufficient to survive summary judgment on the question of whether the employer was guilty of an intentional tort, the *Barrino* dissenters said:

> As Prosser states: "Intent is broader than a desire to bring about physical results. It must extend not only to those consequences which are desired, but also to those which the actor believes are substantially certain to follow from what he does." W. Prosser, *Handbook of the Law of Torts* § 8 (4th ed. 1971). *Accord* Restatement (Second) of Torts § 8A and comment b (1965). The death of Lora Ann Barrino [the employee] . . . was, at the very least, "substantially certain" to occur given defendants' deliberate failure to observe even basic safety laws.

*Id.* at 518, 340 S.E.2d at 305 (Martin, J., dissenting). As discussed in a subsequent portion of this opinion, the dissenters also concluded that the plaintiff was not put to an election of remedies. They thus would have allowed the plaintiff's common law intentional tort claim to proceed to trial on the theory that the defendant intentionally engaged in conduct knowing it was substantially certain to cause serious injury or death. They would also have allowed the plaintiff to pursue both a workers' compensation claim and a civil action.

Today we adopt the views of the *Barrino* dissent. We hold that when an employer intentionally engages in misconduct knowing it is substantially certain to cause serious injury or death to employees and an employee is injured or killed by that misconduct,

WOODSON v. ROWLAND

[329 N.C. 330 (1991)]

that employee, or the personal representative of the estate in case of death, may pursue a civil action against the employer. Such misconduct is tantamount to an intentional tort, and civil actions based thereon are not barred by the exclusivity provisions of the Act. Because, as also discussed in a subsequent portion of this opinion, the injury or death caused by such misconduct is nonetheless the result of an accident under the Act, workers' compensation claims may also be pursued. There may, however, only be one recovery. We believe this holding conforms with general legal principles and is true to the legislative intent when considered in light of the Act's underlying purposes.

Our holding is consistent with general concepts of tort liability outside the workers' compensation context. The gradations of tortious conduct can best be understood as a continuum. The most aggravated conduct is where the actor actually intends the probable consequences of his conduct. One who intentionally engages in conduct knowing that particular results are substantially certain to follow also intends the results for purposes of tort liability. Restatement (Second) of Torts § 8A and comment b (1965) (hereinafter "Rest. 2d of Torts"). "[I]ntent is broader than a desire to bring about physical results. It extends not only to those consequences which are desired, but also to those which the actor believes are substantially certain to follow from what the actor does." W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 8, at 35 (5th ed. 1984) (hereinafter "Prosser"). This is the doctrine of "constructive intent." "As the probability that a [certain] consequence will follow decreases, and becomes less than substantially certain, the actor's conduct loses the character of intent, and becomes mere recklessness. . . . As the probability decreases further, and amounts only to a risk that the result will follow, it becomes ordinary negligence." Rest. 2d of Torts § 8A, comment b.

Prosser discusses the tortious conduct continuum:

Lying between intent to do harm, which . . . includes proceeding with knowledge that the harm is substantially certain to occur, and the mere unreasonable risk of harm to another involved in ordinary negligence, there is a penumbra of what has been called "quasi-intent." To this area, the words "willful," "wanton," or "reckless," are customarily applied; and sometimes, in a single sentence, all three.

Prosser § 34, at 212 (footnotes omitted).

In North Carolina we follow, applying our own terminology, the basic rules discussed in the Restatement and Prosser. We have recognized the doctrine of "constructive intent" and have generally applied it where willful and wanton conduct is present. For a full, scholarly discussion of this doctrine, *see Pleasant*, 312 N.C. 710, 325 S.E.2d 244. This discussion in *Pleasant* makes clear that an actual intent to cause injury is not a necessary element of an intentional tort generally, nor is it required for intentional tort claims based on work-related injuries.

Though the reasons in *Pleasant* for holding co-employees civilly liable for injuries caused by willful and wanton misconduct are sound, it is also in keeping with the statutory workers' compensation trade-offs to require that civil actions against employers be grounded on more aggravated conduct than actions against co-employees. Co-employees do not finance or otherwise directly participate in workers' compensation programs; employers, on the other hand, do. N.C.G.S. § 97-93 (1985). This distinction alone justifies the higher "substantial certainty" threshold for civil recovery against employers.

The substantial certainty standard satisfies the Act's purposes of providing trade-offs to competing interests and balancing these interests, while serving as a deterrent to intentional wrongdoing and promoting safety in the workplace. N.C.G.S. § 95-126(b)(2) (1985).

Other jurisdictions which have considered how egregious employer misconduct must be in order to justify a worker's civil recovery against the employer extraneous to workers' compensation statutes have reached different results. Some require that the employer actually intend to harm the worker, as in a classic assault and battery suit. *See, e.g., Griffin v. George's, Inc.*, 267 Ark. 91, 589 S.W.2d 24 (1979); *see generally* 2A Larson § 68.13 and cases cited therein. Others require the employer's misconduct to be willful and wanton.[2] *See, e.g., Mandolidis v. Elkins Industries, Inc.*, 246 S.E.2d 907 (1978). Still others require intentional conduct which the employer knows is "substantially certain" to cause injury or death. *Bazley v. Tortorich*, 397 So. 2d 475 (La. 1981); *Beauchamp v. Dow Chemical Co.*, 427 Mich. 1, 398 N.W.2d 882 (1986); *Jones v. VIP Development Co.*, 15 Ohio St. 3d 90, 472

---

2. For a good discussion of the meaning of willful and wanton negligence, see *Pleasant*, 312 N.C. at 714-15, 325 S.E.2d at 247-48.

**WOODSON v. ROWLAND**

[329 N.C. 330 (1991)]

N.E.2d 1046 (1984); *Blankenship v. Cincinnati Milacron Chemicals, Inc.*, 69 Ohio St. 2d 608, 433 N.E.2d 572 (1982); *VerBouwens v. Hamm Wood Products*, 334 N.W.2d 874 (S.D. 1983).

It is true that some of the cases adopting the willful and wanton misconduct or substantial certainty standard have been modified by statute. Legislation enacted in Michigan modified the decision in *Beauchamp v. Dow Chemical Co.*, 427 Mich. 1, 398 N.W.2d 882. The legislation provides:

> The only exception [to the exclusivity of workers' compensation] is an intentional tort. An intentional tort shall exist only when an employee is injured as a result of a deliberate act of the employer and the employer specifically intended an injury. *An employer shall be deemed to have intended to injure if the employer has actual knowledge that an injury was certain to occur and willfully disregarded that knowledge.*

Mich. Comp. Laws § 418.131 (Supp. 1990) (emphasis added).

Effective in 1986, the Ohio legislature amended its workers' compensation law in an apparent response to cases such as *Blankenship v. Cincinnati Milacron Chemicals, Inc.*, 69 Ohio St. 2d 608, 433 N.E.2d 572, and *Jones v. VIP Development Co.*, 15 Ohio St. 3d 90, 472 N.E.2d 1046. The Ohio statutory amendments provide for civil recovery outside workers' compensation for acts "committed with the intent to injure another or committed with the belief that the injury is substantially certain to occur." 41 Ohio Rev. Code Ann. § 4121.80 (1990). Although the Ohio amendments equate substantial certainty with the "deliberate intent to cause an employee to suffer injury . . . or death," *id.*, they also treat certain unsafe acts as if they were done with the intent to injure another.

While generally moving away from the willful and wanton misconduct standard enunciated in *Mandolidis v. Elkins Industries, Inc.*, 246 S.E.2d 907, and toward a standard requiring "deliberate intention to injure," W. Va. Code § 23-4-2 (1983), the West Virginia legislature has set out an important exception. The exception allows plaintiffs to recover outside workers' compensation where the employer is aware that there is a high degree of risk of serious harm, and that the conditions creating the risk violate specific safety statutes. *Id.*

On the basis of these kinds of statutory modifications, Rowland Utility urges us to conclude that the willful and wanton misconduct

and substantial certainty standards should be rejected as inconsistent with the legislative purpose of North Carolina's Workers' Compensation Act. We do not read the statutory modifications of judicial decisions in other jurisdictions to repudiate the standards adopted in those decisions. The statutory modifications seem more to narrow the application of, rather than to abolish, these standards. The Michigan legislature provided that "an employer shall be deemed to have intended to injure if the employer had actual knowledge that an injury was certain to occur and willfully disregarded that knowledge." Mich. Comp. Laws § 418.131 (Supp. 1990). This amounts only to a rejection of the substantiality aspect of the substantial certainty standard. The Ohio and West Virginia legislatures essentially redefined what employer conduct will allow tort recovery. These legislative modifications confirm, rather than reject, the proposition that, in those states, actual intent to injure is not required in order for an employer to be civilly liable outside workers' compensation statutes.

At least two other states, Louisiana and South Dakota, continue to apply the substantial certainty standard adopted by their judiciaries, *Bazley v. Tortorich*, 397 So. 2d 475 (La.); *VerBouwens v. Hamm Wood Products*, 334 N.W.2d 874 (S.D.), without legislative modification.

Thus, both courts and legislatures in a fair number of other jurisdictions have rejected the proposition that actual intent to harm is required for an employer's conduct to be actionable in tort and not protected by the exclusivity provisions of workers' compensation. Our adoption of the substantial certainty standard does the same.

### B.

[2] We now apply the substantial certainty standard to the facts. We emphasize that in a summary judgment proceeding, the forecast of evidence and all reasonable inferences must be taken in the light most favorable to the non-moving party. *Wilkes County Vocational Workshop v. United Sleep*, 321 N.C. 735, 365 S.E.2d 292 (1988).

A corporation can act only through its agents, which include its corporate officers. *Raper v. McCrory-McLellan Corp.*, 259 N.C. 199, 130 S.E.2d 281 (1963). For purposes of this appeal plaintiff has forecast sufficient evidence that at all relevant times Morris Rowland as chief executive officer was exercising corporate authori-

ty in directing the trenching operations. We thus examine Morris Rowland's conduct and attribute it to his principal, Rowland Utility. If plaintiff's forecast of evidence is sufficient to show that there is a genuine issue of material fact as to whether Morris Rowland's conduct satisfies the substantial certainty standard, then plaintiff is entitled to take her case against Rowland Utility to trial.

We conclude that plaintiff's forecast of evidence is sufficient to raise such a material issue of fact against Rowland Utility. Agronomist James Rees, offered as an expert in soil and environmental analysis, submitted an affidavit on the status of the soil where the cave-in occurred. He stated:

> Based on my review of the physical conditions existent at the time of the trench collapse, as nearly as they can be determined, and on the nature and physical conditions of the surface and subsurface materials, my conclusion is that the trench as constructed by Morris Rowland Utility, Inc. consisting of sheer, vertical walls approximately fourteen feet deep, had an exceedingly high probability of failure, and the trench was substantially certain to fail.

From this evidence, a reasonable juror could determine that upon placing a man in this trench serious injury or death as a result of a cave-in was a substantial certainty rather than an unforeseeable event, mere possibility, or even substantial probability.

There is also evidence to indicate that Morris Rowland knew of this substantial certainty. Neither we, nor later the jury, need accept his characterization of his state of mind at face value. Other evidence is available from which his state of mind can be inferred. *See, e.g., Waste Management of Carolinas, Inc. v. Peerless*, 315 N.C. 688, 700 n.6, 340 S.E.2d 374, 383 n.6 (1986) (recurrent evidence of "accidental" toxic emissions allows inference that they were intentional). There is evidence that Morris Rowland was capable of discerning extremely hazardous ditches. His career had been excavating different kinds of soil. He knew the attendant risks. He had been cited at least four times in six and one-half years immediately preceding this incident for violating multiple safety regulations governing trenching procedures. He was aware of safety regulations designed to protect trench diggers from serious injury or death. He knew he was not following these regulations in digging the trench in question.

Davidson & Jones foreman Lynn Craig testified that the trench at point of collapse was "unsafe" and that he would "never put a man in it" without a trench box or other precautions. Craig was an experienced construction worker with knowledge about soil composition and the dangers associated with deep-ditch trenching. His emphatic indication that the trench was unsafe could lead reasonable jurors to conclude that Morris Rowland, who was also at the trench and equally capable of observing its dangerous tenden- · cies, shared Craig's knowledge and disregarded the substantial certainty of a cave-in resulting in serious injury or death. Rowland's attempts to rush Greene the previous day and his commencement of hasty, unsafe procedures, including his failure to use the available trench box, would offer the jury a motive for his conduct-swift completion of the project, whatever the risk.

Morris Rowland's knowledge and prior disregard of dangers associated with trenching; his presence at the site and opportunity to observe the hazards; his direction to proceed without the required safety procedures; Craig's experienced opinion that the trench was unsafe; and Rees' scientific soil analysis converge to make plaintiff's evidentiary forecast sufficient to survive Rowland Utility's motion for summary judgment.

We reject Rowland Utility's reasons for concluding to the contrary. Rowland Utility contends that no reasonable business person would knowingly engage in conduct that is substantially certain to cause a trench cave-in because of the significant delay in work and additional cost that such an event would cause. This argument is more properly directed toward the jury at trial rather than to the Court on summary judgment.

At least one court has indicated that a trench cave-in may satisfy the substantial certainty standard. In *Beauchamp v. Dow Chemical Co.*, 427 Mich. 1, 398 N.W.2d 882, the Michigan Supreme Court discussed the trench cave-in case of *Serna v. Statewide Contractors*, 6 Ariz. App. 12, 429 P.2d 504 (1967). The *Beauchamp* Court indicated that the failure to observe trenching safety procedures and the resulting cave-in discussed in *Serna* would likely have presented a valid claim had the *Serna* court applied the substantial certainty standard. *Beauchamp*, 427 Mich. at 23, 398 N.W.2d at 892.

Rowland Utility also argues that its placing Alan Fry, son of project supervisor Elmer Fry, into the trench with the ac-

quiescence of Elmer Fry is inconsistent with Rowland Utility's knowledge that a cave-in was a substantial certainty. The argument is that Elmer Fry would never have agreed to put his son in the trench had he appreciated the danger and that since Elmer Fry did not appreciate the danger, neither did Morris Rowland. Again, this is an argument more properly directed to the jury, which on all the evidence can determine whether the state of Morris Rowland's knowledge and appreciation of the risk was more like Elmer Fry's on the one hand or Lynn Craig's on the other.

C.

[3] Plaintiff next asks us to hold that the forecast of evidence is sufficient to survive Morris Rowland's motion for summary judgment in his individual capacity. She contends that the forecast of evidence at least raises a genuine issue of material fact as to whether Morris Rowland was acting as her decedent's co-employee and is, therefore, liable under *Pleasant* for willful and wanton misconduct. Morris Rowland contends that since the forecast of evidence shows without contradiction that he is president and sole shareholder of Rowland Utility, he cannot be held liable individually as a co-employee of the decedent. He must, rather, be treated as the "alter ego" of the corporation itself.

Since the evidentiary forecast shows that Morris Rowland was at all material times the president and sole shareholder of Rowland Utility, and was acting in furtherance of corporate business, we conclude that any individual liability on his part must be based on the same standard as that applied to the corporation. A number of jurisdictions have held that where corporate employers could not be held civilly liable because of the exclusivity provisions of workers' compensation acts, neither could corporate officers and directors acting in their capacities as such. *See, e.g., Simmons First National Bank v. Thompson*, 285 Ark. 275, 686 S.W.2d 415 (1985); *Zurich Insurance Co. v. Scofi*, 366 So. 2d 1193 (Fla. Dist. Ct. App.), *cert. denied*, 378 So. 2d 348 (Fla. 1979); *Athas v. Hill*, 300 Md. 133, 476 A.2d 710 (1984); *Kruse v. Schieve*, 61 Wis. 2d 421, 213 N.W.2d 64 (1973). The import of these holdings is that, in the workers' compensation context, corporate officers and directors are treated the same as their corporate employer vis-a-vis application of the exclusivity principle. Following this reasoning, we hold that Morris Rowland may be held individually liable on

the same basis as Rowland Utility. His liability, like that of the corporation, must be determined under the substantial certainty standard.

Our holding is consistent with the principle that agents of corporations and the corporations themselves may both be held liable for the agent's torts committed in the course and scope of the agency relationship under the doctrine of *respondeat superior*. *See, e.g., Mills v. Mills*, 230 N.C. 286, 52 S.E.2d 915 (1949).

Since plaintiff's forecast of evidence tending to establish Rowland Utility's liability is dependent on the actions of Morris Rowland, and since this forecast is sufficient to survive Rowland Utility's motion for summary judgment, it is *a fortiori* sufficient to survive Morris Rowland's motion for summary judgment.

D.

**[4]** Although, for the reasons stated, plaintiff may continue to pursue her civil action, we also conclude she is not barred from simultaneously pursuing her workers' compensation claim because the injury to her intestate was the result of an "accident" as that term is used in the Act. A claimant may, but is not required to, elect between these remedies but, in any event, is entitled to but one recovery.

"Accident" under the Act means "(1) an unlooked for and untoward event which is not expected or designed by the injured employee; (2) a result produced by a fortuitous cause." *Harding v. Thomas & Howard Co.*, 256 N.C. 427, 428, 124 S.E.2d 109, 110-11 (1962); *see Rhinehart v. Market*, 271 N.C. 586, 157 S.E.2d 1 (1967). Because employees do not expect to suffer intentional torts committed against them while on the job, such injuries are "unlooked for and untoward events . . . not expected or designed by the injured employee," *Harding*, 256 N.C. at 428, 124 S.E.2d at 110-11. The employee may treat these injuries as accidental and accept workers' compensation benefits. *See Pleasant*, 312 N.C. 710, 325 S.E.2d 244, and cases cited therein; *Warner v. Leder*, 234 N.C. 727, 69 S.E.2d 6 (1952); *Andrews v. Peters*, 55 N.C. App. 124, 284 S.E.2d 748 (1981), *disc. rev. denied*, 305 N.C. 395, 290 S.E.2d 364 (1982) (cited with approval in *Pleasant*).

While plaintiff has pursued her civil suit, she has received no benefits for accidental injury under the Act. Thus, there is not the election of remedies problem presented in *Barrino*.

**WOODSON v. ROWLAND**

[329 N.C. 330 (1991)]

Nonetheless, insofar as *Barrino; Wesley v. Lea*, 252 N.C. 540, 114 S.E.2d 350 (1960); and *Warner v. Leder*, 234 N.C. 727, 19 S.E.2d 6 (1952),[3] can be read to hold that simultaneous pursuit of civil and workers' compensation remedies are inherently inconsistent and an election of remedies is required, these cases are overruled.

From the standpoint of the injured party, an injury intentionally inflicted by another can nonetheless at the same time be an "unlooked for and untoward event . . . not expected or designed by the injured employee." *Harding*, 256 N.C. at 428, 124 S.E.2d at 110. It is, therefore, not inherently inconsistent to assert that an injury caused by the same conduct was both the result of an accident, giving rise to the remedies provided by the Act, and an intentional tort, making the exclusivity provision of the Act unavailable to bar a civil action.

Allowing an injured worker to pursue both avenues to relief does not run afoul of the goal of the election doctrine, which is to prevent double redress of a single wrong. *Smith v. Oil Corp.*, 239 N.C. 360, 79 S.E.2d 880 (1954). Although the worker may pursue both statutory and common law remedies, the worker ultimately is entitled to only one recovery. Double recovery should be avoided by requiring the claimant who recovers civilly against his employer to reimburse the workers' compensation carrier to the extent the carrier paid workers' compensation benefits, or by permitting the carrier to become subrogated to the claimant's civil claim to the extent of benefits paid.

As the *Barrino* dissent points out:

The result thus obtained would be a more equitable one than forcing an employee who believes in good faith that he was injured by the intentional misconduct of his employer to forego his compensation claim in order to maintain his common law claim. An injured employee having financial difficulties would be likely to accept workers' compensation benefits and forego a valid tort claim because he would have no real alternative. Such a policy would not serve to discourage intentional employer misconduct. Finally, the doctrine of election of remedies presupposes a "choice" between one or more inconsistent remedies. *NASCAR, Inc. v. Midkiff*, 246 N.C. 409, 98 S.E.2d 468 (1957).

---

3. *Wesley* and *Warner* have already been partially overruled by *Pleasant*.

An employee in severe economic straits who makes a decision based solely on the exigencies of his immediate situation cannot be considered as having freely "chosen" one remedy over another.

*Barrino*, 315 N.C. at 522, 340 S.E.2d at 308 (Martin, J., dissenting).

### III.

We next decide whether plaintiff may proceed to trial against Davidson & Jones and Pinnacle One on her claims that they breached nondelegable duties of safety owed to plaintiff's decedent. We hold plaintiff may take her case against Davidson & Jones to trial, but summary judgment was properly allowed on her claim against Pinnacle One.

### A.

[5] Generally, one who employs an independent contractor is not liable for the independent contractor's negligence unless the employer retains the right to control the manner in which the contractor performs his work. *Mack v. Marshall Field & Co.*, 218 N.C. 697, 12 S.E.2d 235 (1940). Plaintiff can recover neither from Davidson & Jones nor from Pinnacle One unless the circumstances surrounding the trench cave-in place her claim within an exception to this general rule.

Plaintiff contends her action falls within such an exception. She argues that Davidson & Jones and Pinnacle One breached nondelegable duties of safety owed to decedent because the trenching project was an "inherently dangerous activity" and these defendants failed to take adequate measures to correct Rowland Utility's poor safety practices.

In considering this argument, it is necessary to clarify what types of activities fall under particular rules governing liability. We consider ultrahazardous activities, inherently dangerous activities, and activities that are neither.

The most commonly recognized example of an ultrahazardous activity is blasting. *Insurance Co. v. Blythe Brothers*, 260 N.C. 69, 131 S.E.2d 900 (1963). Parties whose blasting proximately causes injury are held strictly liable for damages, *id.*, largely because reasonable care cannot eliminate the risk of serious harm. *See* Rest. 2d of Torts § 520; *cf.* Restatement of Torts § 520. Because these activities are extremely dangerous, they must "pay their

**WOODSON v. ROWLAND**

[329 N.C. 330 (1991)]

own way," C. Daye and M. Morris, *North Carolina Law of Torts*, § 20.40, at 355 (1991) ("Daye"), and the parties who are responsible must bear the cost regardless of whether they have been negligent. North Carolina courts have not yet recognized as ultrahazardous any activities other than blasting. *Id.*

The likelihood of serious harm arising from inherently dangerous activities is less than that associated with ultrahazardous activities, and proper safety procedures can substantially eliminate the danger. Unlike ultrahazardous activities, inherently dangerous activities are susceptible to effective risk control through the use of adequate safety precautions. *Evans v. Rockingham Homes, Inc.*, 220 N.C. 253, 17 S.E.2d 125 (1941). The mere fact that an activity can be done safely upon compliance with such procedures does not, for purposes of establishing liability, alter its fundamental characteristic of being inherently dangerous. Rather, taking the necessary safety precautions can demonstrate reasonable care protecting the responsible party from liability under a negligence standard. Liability for injuries caused by such activities is not strict, but is based on negligence. *Dockery v. World of Mirth Shows, Inc.*, 264 N.C. 406, 142 S.E.2d 29 (1965). The reason for imposing a negligence standard for liability resulting from inherently dangerous activities is that exercise of reasonable care can control the risk, and the responsible parties will not be held liable unless they have caused injury by failing to do so.

Our case law distinguishes between ultrahazardous activities, inherently dangerous activities, and those that are safe unless performed negligently:

> The courts have found no universal rule of application by which they may abstractly draw a line of classification in every case between work which is inherently dangerous and that which is not. The subject must not be confused with concepts of *hazardous employment*, usually involving a high degree of danger, since here we are dealing with danger which manifests itself to the general public. It is not essential, to come under the rule, that the work should involve a major hazard. It is sufficient if there is a recognizable and substantial *danger inherent in the work*, as distinguished from a *danger collaterally created* by the independent negligence of the contractor, which latter might take place on a job itself involving no inherent danger.

*Evans*, 220 N.C. at 258-59, 17 S.E.2d at 128 (emphasis added). When considering whether an activity is inherently dangerous, "[m]ere liability to injury is not the test, as injuries may result in any kind of work where it is carelessly done, although with proper care it is not especially hazardous." *Vogh v. F.C. Geer Co.*, 171 N.C. 672, 676, 88 S.E. 874, 876 (1916). "There is an obvious difference between committing work to a contractor to be executed, from which if properly done, no injurious consequences can arise, and handing over to him work to be done from which mischievous consequences will arise unless preventive measures are adopted." *Greer v. Construction Co.*, 190 N.C. 632, 637, 130 S.E. 739, 743 (1925).

One who employs an independent contractor to perform an inherently dangerous activity may not delegate to the independent contractor the duty to provide for the safety of others:

> "The liability of the employer rests upon the ground that mischievious [sic] consequences will arise from the work to be done unless precautionary measures are adopted, and the duty to see that these precautionary measures are adopted rests upon the employer, and he cannot escape liability by entrusting this duty to another as an 'independent contractor' to perform." *Thomas v. Lumber Co.*, 153 N. C., 351, 69 S. E., 275.

*Evans*, 220 N.C. at 259, 17 S.E.2d at 128-29. The party that employs the independent contractor has a continuing responsibility to ensure that adequate safety precautions are taken. *Dockery v. World of Mirth Shows, Inc.*, 264 N.C. 406, 142 S.E.2d 29.

The rule imposing liability on one who employs an independent contractor applies "whether [the activity] involves an appreciable and foreseeable danger to the workers employed or to the public generally." *Evans*, 220 N.C. at 260, 17 S.E.2d at 129. The employer's liability for breach of this duty "is direct and not derivative since public policy fixes him with a nondelegable duty to see that the precautions are taken." *Dockery*, 264 N.C. at 410, 142 S.E.2d at 32; *Evans*, 220 N.C. at 259, 17 S.E.2d at 129.

Imposition of this nondelegable duty of safety reflects "the policy judgment that certain obligations are of such importance that employers should not be able to escape liability merely by hiring others to perform them." Daye, § 23.31, at 393 (citing *Royal v. Dodd*, 177 N.C. 206, 209-11, 98 S.E. 599, 600-02 (1919) ). By holding both an employer and its independent contractor responsible for

**WOODSON v. ROWLAND**

[329 N.C. 330 (1991)]

injuries that may result from inherently dangerous activities, there is a greater likelihood that the safety precautions necessary to substantially eliminate the danger will be followed.

The dissent suggests that activities are either inherently dangerous or not as a matter of law. We agree that in some cases such a determination can, as a matter of law, be made. For example, *Evans* held as a matter of law that maintaining an open trench in a heavily populated area is inherently dangerous from the standpoint of the public, and the landowner who hired an independent contractor could be held liable for the injuries of a child who fell into the trench negligently left open by the independent contractor. *Evans*, 220 N.C. 253, 17 S.E.2d 125. *Greer v. Construction Co.*, 190 N.C. 632, 130 S.E. 739, held that blasting is inherently dangerous, an early approach to imposing liability for injuries caused by blasting and only later changed by adoption of the majority strict liability standard in *Insurance Co. v. Blythe Brothers*, 260 N.C. 69, 131 S.E.2d 900. *Peters v. Carolina Cotton & Woolen Mills, Inc.*, 199 N.C. 753, 155 S.E. 867 (1930), held that installing electrical wires is an inherently dangerous activity, calling for proper safety precautions such as insulation.

Similarly, this Court has held as a matter of law that certain activities resulting in injury are not inherently dangerous. These activities include sign erection, *Brown v. Texas Co.*, 237 N.C. 738, 76 S.E.2d 45 (1953), and generally, building construction. *Vogh v. F.C. Geer Co.*, 171 N.C. 672, 88 S.E. 874.

Despite the fact that some activities are always inherently dangerous while others may never be, unlike the dissenters, we do not believe every act can be defined as inherently dangerous or not, regardless of the attendant circumstances. Though bright-line rules are beneficial where appropriate, their usefulness can be limited. "The life of the law has not been logic: it has been experience. . . . The law embodies the story of a nation's development through many centuries, and it cannot be dealt with as if it contained only the axioms and corollaries of a book of mathematics." O. W. Holmes, Jr., *The Common Law*, Lecture 1, at 1 (1881).

*Evans*, 220 N.C. 253, 17 S.E.2d 125, reflects that bright-line rules and mathematical precision are not always compatible with discerning whether an activity is inherently dangerous. While holding as a matter of law that digging a trench in a heavily populated

area is inherently dangerous, *Evans* nonetheless recognized that digging the same trench in a different locale would not be:

> [T]o dig a drain ditch in a pasture, far from human habitation, certainly would not be considered dangerous; but an excavation of that character a yard wide and three and one-half feet deep in a thickly populated area, where many persons have and exercise the right to be, is, we think, if left without adequate precautions, too obviously dangerous to be debatable.

*Evans*, 220 N.C. at 260-61, 17 S.E.2d at 130. Particular trenching situations, which lie between the two examples given in *Evans*, appropriately require a jury to decide the inherently dangerous issue.

Courts considering the inherent danger of putting a man in a deep trench have reached conflicting results. Some have held it not to be inherently dangerous, *see, e.g., Cummings v. Hoosier Marine Properties, Inc.*, 173 Ind. App. 372, 363 N.E.2d 1266 (1977), while others have held the question is for the jury. *See, e.g., Smith v. Inter-City Telephone Co.*, 559 S.W.2d 518 (Mo. 1977) (en banc). We think the latter approach is the better reasoned.

This Court has addressed the danger of trenching on a case-by-case basis. In *Darden v. Lassiter*, 198 N.C. 427, 152 S.E. 32 (1930), plaintiff's intestate was killed when an incompletely shored trench in which he was working collapsed. Plaintiff sued his employer, alleging breach of duty to provide a safe workplace. In an opinion by Chief Justice Stacy, the Court said:

> Whether "fine grading" in the bottom of a trench . . . is dangerous . . . would seem to depend upon a variety of circumstances. In some cases, it might be entirely safe; in others, not. The size and dimensions of the trench might affect it. The character of the soil would certainly have some influence. . . . [T]he moisture in the ground . . . might render such work more or less safe, or more or less hazardous. The state of the weather or the season of the year might have something to do with it. But all of these are matters of fact, about which there may be conflicting evidence, as in the instant case, calling for determination by a jury.

*Id.* at 429, 152 S.E. at 33-34; *accord Harper v. Murray Construction Co.*, 200 N.C. 47, 156 S.E. 137 (1930). In *Barnhardt v. Concord*, 213 N.C. 364, 196 S.E. 310 (1938), an unshored trench on a city street collapsed, killing the plaintiff's intestate who was working

WOODSON v. ROWLAND

[329 N.C. 330 (1991)]

in the trench. The intestate was employed by the Emergency Relief Administration (ERA), an independent contractor with the City of Concord. In a prior proceeding before the Industrial Commission, the plaintiff's claim was dismissed on the ground that the deceased was not an employee of the City. The civil action was likewise dismissed on the ground that the intestate was neither an employee of the City nor of the ERA. In dictum, the Court suggested that the Industrial Commission "could have heard the case against defendants on the 'intrinsically dangerous' doctrine and held jurisdiction, but this they did not do." *Id.* at 366, 196 S.E. at 311.

Literature issued by the Department of Labor, Division of Occupational Safety and Health, bears out our view that trenching can be inherently dangerous:

> Two primary reasons account for the occurrence of deaths and injuries in trenching and excavation sites: (1) The walls of the trench in which employees are working are not sloped, shored, sheeted, braced or otherwise supported in accordance with North Carolina Occupational Safety and Health Standards and (2) there is not adequate means for the employees to exit the trench.

P. McCain and D. Johnston, *An Introductory Guide to the 1989 OSHA Excavations Standard* at ix ("Excavation Guide"). This pamphlet recounts case histories in which people were seriously injured or killed when OSHANC safety procedures were not observed.[4] *Id.* The pattern is that a worker goes into a deep trench and is injured or killed by a cave-in. Had precautions required by the nature of the trench been taken, the injury or death would not likely have occurred. As these situations show, it may be inherently dangerous to put a man in a deep trench, but following certain safety precautions will substantially eliminate the risk and allow parties responsible under the doctrine of nondelegable duties of safety to avoid liability.

The Department of Labor literature and OSHANC regulations also show that the danger of trenching should be considered on a case-by-case basis. Numerous factors, including soil characteristics, vibrations, surface encumbrances, water conditions, and depth, contribute to how dangerous a trench is. *Excavation Guide.* For exam-

---

4. One of the case histories involves the death of Thomas Sprouse, the decedent in this case. *Id.*

ple, digging in stable rock does not require safety precautions such as shoring or sloping, whereas digging in more porous soil would. *Id.*; N.C.G.S. § 95-136(g); 13 N.C. Admin. Code 7E.1400, *et seq.*; *cf.* 29 C.F.R. § 1926.650-.653. Because different statutory procedures are required under different conditions, trenching may be inherently dangerous in some situations, requiring numerous precautions, and not inherently dangerous in other situations.

In determining whether the trenching process which killed Thomas Sprouse was inherently dangerous, the focus is not on some abstract activity called "trenching." The focus is on the particular trench being dug and the pertinent circumstances surrounding the digging. It must be shown that because of these circumstances, the digging of the trench itself presents "a recognizable and substantial danger inherent in the work, as distinguished from a danger collaterally created by the independent negligence of the contractor." *Evans*, 220 N.C. at 259, 17 S.E.2d at 128.

We conclude the forecast of evidence is sufficient to survive summary judgment on the question of whether the trenching in this case was "inherently dangerous."

Davidson & Jones' foreman Lynn Craig stated that the trench at point of collapse was "unsafe" and that on the evening before it "could have been safer." Agronomist James Rees stated in his affidavit that

> the trench . . . consisting of sheer, vertical walls approximately fourteen feet deep, had an exceedingly high probability of failure, and the trench was substantially certain to fail. The trench collapse, in my opinion, was caused by the verticality and depth of the walls under the conditions then existent, given nature of the soil and parent materials and the natural and mechanical forces acting on the walls.

This forecast of evidence is sufficient to survive summary judgment on whether the particular trench in question was inherently dangerous, requiring special safety precautions to render it safe.

### B.

If the jury finds that the trenching in question here was or had become at the time of the cave-in an inherently dangerous activity, then Davidson & Jones, if it knew of the circumstances creating the danger, cannot escape liability by merely relying on

the legal ground that Rowland Utility was an independent contractor. Rather, it would have a nondelegable duty to exercise due care to see that plaintiff's intestate was provided a safe place in which to work and proper safeguards against any dangers as might be incident to the work. *Greer v. Construction Co.*, 190 N.C. 632, 130 S.E. 739; *cf. Brown v. Texas Co.*, 237 N.C. 738, 76 S.E.2d 45. If Davidson & Jones did not exercise such care to ensure safety, it is liable.

Plaintiff's forecast of evidence on the issue of Davidson & Jones' negligence is sufficient to survive summary judgment. This forecast tends to show as follows: Davidson & Jones knew on Saturday, 3 August, that the trench in which plaintiff was working was unsafe in that it was not being properly sloped, shored, or braced, and that a trench box was not being used. It knew these precautions were required by OSHANC for the safety of the workers. Craig had asked Morris Rowland to procure a trench box for the Davidson & Jones crew. Knowing of the dangers associated with the Rowland Utility ditch, Davidson & Jones did not itself act to ameliorate the dangers.

That Craig did not view the ditch on Sunday, 4 August, the day of the collapse, does not alter our conclusion that plaintiff's forecast is sufficient to survive summary judgment. Davidson & Jones' duty to exercise due care in providing a safe work place for plaintiff's intestate was nondelegable and on-going. According to plaintiff's forecast, Davidson & Jones knew at all material times preceding the cave-in that Rowland Utility was not following standard, regulatory safety procedures. Davidson & Jones had a continuing duty of due care toward plaintiff's intestate during this entire time, and plaintiff's forecast of evidence tends to show a breach of this duty. It is therefore sufficient to survive summary judgment.

C.

[6] Plaintiff also seeks to hold Pinnacle One liable on a theory of breach of a nondelegable duty to her intestate to provide him with a safe working environment. Pinnacle One was the developer on this project, in which capacity it hired Davidson & Jones as general contractor. We need not decide whether Pinnacle One, like Davidson & Jones, owed a nondelegable duty to plaintiff's intestate. Assuming that it did, we find nothing in the forecast of evidence to show that such a duty was breached by Pinnacle One. There is nothing in the forecast indicating that Pinnacle One

or any of its representatives knew or should have known that Davidson & Jones had hired Rowland Utility, much less of the trenching activity in which plaintiff's intestate was engaged or the dangerous propensities of the particular trench in question. There is no forecast that Pinnacle One had any knowledge or expertise regarding safety practices in the construction industry generally or in trenching particularly. So far as the forecast of evidence shows, Pinnacle One justifiably relied entirely on the expertise of its general contractor Davidson & Jones.

IV.

[7]  Plaintiff next seeks to hold the general contractor Davidson & Jones liable for negligently selecting and retaining Rowland Utility as its subcontractor. We conclude plaintiff's forecast of evidence is insufficient to survive summary judgment on these theories, assuming they are available to an employee of the subcontractor, a question which we do not here decide.

So far as our law has developed in this area, it may be stated as follows: An employee injured by the negligence of an incompetent or unqualified fellow employee may recover against the employer of both on the theory that the employer negligently hired, or after hiring, negligently retained the incompetent fellow employee. *Pleasants v. Barnes*, 221 N.C. 173, 19 S.E.2d 627 (1942); *Walters v. Durham Lumber Co.*, 163 N.C. 536, 80 S.E. 49 (1913); *Hogan v. Forsyth Country Club Co.*, 79 N.C. App. 483, 340 S.E.2d 116, *disc. rev. denied*, 317 N.C. 334, 346 S.E.2d 140 (1986). A third party not contractually related to and injured by an incompetent or unqualified independent contractor may proceed against one who employed the independent contractor on the theory that the selection was negligently made. *Page v. Sloan*, 281 N.C. 697, 190 S.E.2d 189 (1972).

We have not yet considered whether an injured employee of the incompetent or unqualified independent contractor can obtain relief from the party who negligently hired or retained the independent contractor. However, we need not decide here this question because our conclusion is that even if such theories are available to plaintiff, whose intestate was an employee of Rowland Utility, the forecast of evidence is insufficient to survive summary judgment.

This forecast tends to show as follows: Davidson & Jones had worked with Rowland Utility on approximately seventeen prior

occasions, leading several Davidson & Jones supervisors to believe that Rowland Utility was a competent contractor which exercised adequate safety procedures. None of the supervisors knew that Rowland Utility had received OSHANC citations. Nothing indicated to Davidson & Jones that Rowland Utility was "incompetent" or "unqualified." Because of its past direct experience with Rowland Utility, Davidson & Jones did not investigate Rowland Utility's safety record. Had Davidson & Jones investigated, it would have discovered Rowland Utility's numerous OSHANC violations.

Under these circumstances, we conclude plaintiff will be unable at trial to establish any lack of due care on the part of Davidson & Jones in hiring Rowland Utility. Plaintiff has referred us to no case, and our research has revealed none, which establishes a duty to investigate a licensed subcontractor's safety record when the contractor has had a substantial positive and safe prior working relationship with the subcontractor.

With regard to the theory that Davidson & Jones negligently retained Rowland Utility after learning of its alleged malfeasances, the forecast of evidence tends to show as follows: Davidson & Jones knew on Saturday, 3 August, that Rowland Utility was neither using a trench box, nor shoring, bracing, nor sloping the trench as well as Davidson & Jones would have liked and OSHANC required. Craig said that the trench "could have been safer." There is some evidence that the walls of the trench were vertical by the end of the day on Saturday, in itself an unsafe condition. The quality of the safety procedures further deteriorated as work progressed on Sunday. Having no one on site, Davidson & Jones did not know of this deterioration. The cave-in occurred at 9:30 that morning.

We hold this forecast of evidence insufficient to survive Davidson & Jones' motion for summary judgment on plaintiff's negligent retention claim. Once a contractee knows or should know that an independent contractor is incompetent or unqualified to do the work for which he was hired, the contractee, in order to be found liable on the theory that he negligently retained the independent contractor, must have had a reasonable opportunity to discharge the independent contractor. What constitutes a reasonable opportunity depends on the circumstances. They include the gravity of the risk posed, the contractee's own ability to correct the situation, the difficulty, if any, of replacing the independent contractor,

the time needed to investigate the events in question, the contractee's potential exposure to liability for breach of contract in the event the discharge is not justified, and the contractee's reasonable reliance on the independent contractor ultimately fulfilling his responsibilities.

Applying these considerations to the facts, we hold the forecast of evidence insufficient to survive Davidson & Jones' motion for summary judgment on plaintiff's negligent retention claim. Even if what Davidson & Jones knew by the end of the day on Saturday, the day before the cave-in, was enough to put it on notice that Rowland Utility was incompetent or unqualified, Davidson & Jones had no reasonable opportunity thereafter to discharge Rowland Utility before the trench cave-in occurred. Rowland Utility could not have been discharged at will. It had a contractual relationship with Davidson & Jones. Assuming that Rowland Utility's conduct on Saturday could have put it in breach of the provisions in its contract with Davidson & Jones requiring compliance with OSHANC regulations, Davidson & Jones nevertheless needed to consider and weigh this circumstance. It needed a reasonable time to reflect on the likelihood of its liability in the event a precipitous discharge of Rowland Utility could constitute a breach of contract on its part. This is not the kind of decision that can reasonably be made without some opportunity for careful reflection. On the facts before us Davidson & Jones did not have that opportunity.

V.

In conclusion, and for the reasons given, we reverse the Court of Appeals' decision insofar as it affirms summary judgments in favor of Rowland Utility and Morris Rowland, and in favor of Davidson & Jones on plaintiff's claim for breach of nondelegable duty of safety, and we remand for further proceedings against these defendants consistent with our opinion. We affirm the Court of Appeals' decision insofar as it allows summary judgments in favor of Pinnacle One, and in favor of Davidson & Jones on the negligent hiring and retention claims.

The result is

Affirmed in part; reversed in part; remanded.

**WOODSON v. ROWLAND**

[329 N.C. 330 (1991)]

Justice MITCHELL concurring in part and dissenting in part.

I concur in Part III D of the majority opinion holding that summary judgment was properly entered in favor of the defendant Pinnacle One Associates, Inc. I also concur in Part IV of the majority opinion holding that summary judgment was properly entered in favor of the defendant Davidson & Jones, Inc. with regard to the plaintiff's claim against that defendant for negligently selecting and retaining Morris Rowland Utility, Inc. as its subcontractor.

I dissent from Parts III A, B and C of the majority opinion in which the majority holds that the plaintiff may proceed to trial against Davidson & Jones, Inc. on the theory that it breached a non-delegable duty of safety owed to the plaintiff's decedent. The majority appears to recognize that Davidson & Jones, Inc. did not retain the right to control the manner in which the independent contractor it employed performed the work in question here. Therefore, the majority acknowledges that the plaintiff cannot recover from Davidson & Jones, Inc. on this theory, unless the plaintiff can show that her claim falls within an exception to the general rule prohibiting recovery against one who employs an independent contractor and does not retain the right to control the manner in which it performs the work to be done. In finding such an exception here, the majority relies upon the rule that one who employs an independent contractor to perform an inherently dangerous activity may not delegate to the independent contractor the duty to provide for the safety of others. The majority concludes that under the circumstances presented in this case, a jury could reasonably find that the trenching involved was an inherently dangerous activity for which Davidson & Jones, Inc. could not delegate its duty to provide for the safety of the plaintiff's decedent. I do not agree.

An activity is either inherently dangerous or it is not. If an activity may be conducted in an entirely safe manner when ordinary safety precautions are taken but may be hazardous if performed in a negligent manner, it is not an "inherently dangerous" activity in my view. *See* Black's Law Dictionary 782 (6th ed. 1990). Here, the record reveals and the majority concedes that the trenching activity leading to the cave-in which killed the plaintiff's decedent could have been performed safely if ordinary safety precautions, such as sloping the shoulders of the trench or the use of a trench box, had been employed. Therefore, it would seem to follow *ipso*

*facto* that the trenching was not inherently dangerous. For that reason, I dissent from the majority's conclusion that this claim by the plaintiff may be found to fall within an exception to the general rule that an employer is not liable for its independent contractor's negligence where, as here, it has not retained the right to control the manner in which the work undertaken is to be performed. I would affirm the holding of the Court of Appeals that the trial court properly entered summary judgment for the defendant Davidson & Jones, Inc. with regard to this claim for relief.

Finally, for reasons fully set forth in the thoughtful opinion of Judge Eagles (Judge Parker concurring) in the Court of Appeals, I dissent from Part II of the opinion of the majority of this Court. *Woodson v. Rowland*, 92 N.C. App. 38, 40-42, 373 S.E.2d 674, 675-77 (1988). In Part II, the majority holds that the exclusivity provision of the North Carolina Workers' Compensation Act, N.C.G.S. § 97-10.1, does not apply here and that the plaintiff may recover in a civil action against the defendants Morris Rowland and Morris Rowland Utility, Inc. for conduct substantially certain to cause injury. Although I concede that the majority's holding represents reasonable and perhaps desirable social policy, I must agree with the Court of Appeals that to give an employee, in addition to the rights available under our Workers' Compensation Act, a right to bring a civil action "against his employer, even for gross, willful and wanton negligence, would skew the balance of interests inherent in [the] . . . Act. Changes in the Act's delicate balance of interests is more properly a legislative prerogative than a judicial function." *Id.* at 42, 373 S.E.2d at 677. *See generally Pleasant v. Johnson*, 312 N.C. 710, 325 S.E.2d 244 (1985) (describing the Act's balance of interests between employers and employees). Therefore, I would affirm the holding of the Court of Appeals that the trial court properly entered summary judgment for the defendants Morris Rowland and Morris Rowland Utility, Inc.

Justice MEYER joins in this concurring and dissenting opinion.