***********
The undersigned reviewed the prior Decision and Order, based upon the record of the proceedings before Deputy Commissioner Glenn. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives or amend the Decision and Order.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over the parties and this claim. The parties are subject to and bound by the provisions of the North Carolina Tort Claim Act.
2. The injury and losses claimed by plaintiff occurred on Monday, January 22, 2001 over U.S. Highway I-85, on the Brentwood Bridge construction site in High Point, North Carolina (hereinafter referred to as the "job site").
3. North Carolina Department of Transportation (hereinafter referred to as "NCDOT") contracted Blythe Construction Company (hereinafter "Blythe") to be the general contractor on the job site, including the removal of the Brentwood Bridge.
4. The contract with Blythe provided that Blythe would be responsible for complying "with all applicable Federal, State, and local laws, ordinances, and regulations governing safety, health, and sanitation, and shall provide all safeguards, safety devices, and protective equipment, and shall take any other needed actions, on his own responsibility that are reasonably necessary to protect the life and health of employees on the job. . . ."
5. NCDOT contracted with Kissinger, Campo Associates Corporation (hereinafter "KCA"), for engineering services consistent with the contract entered into evidence as plaintiff's Exhibit 5. The KCA engineer (hereinafter "inspector") on this job site was Benny Horton.
6. The inspector's job duties included quality control and setting up traffic control. Mr. Horton maintained daily reports which included a list of the workers on site, the equipment on site, weather conditions, the time work began and was completed and issues regarding traffic control. The inspector was responsible for his own safety and the safety of the traveling public. He was not responsible for ensuring the safety of the other workers on the job site; however, he would generally encourage them to "be safe."
7. If Mr. Horton, the inspector, saw something unsafe, he would talk to the foreman and ask him to correct it. However, he had no power to control the manner of the work or to force the general contractor to stop working. If the foreman refused to correct something that the inspector knew was unsafe, the inspector could then report it to NCDOT. Mr. Horton never reported any safety violations on this job site to NCDOT.
8. Mr. Horton testified that he checked traffic control every hour and that it took him approximately thirty minutes to complete each inspection.
9. Blythe, the general contractor, had its own safety director who was responsible for ensuring that the workers on the job site complied with the applicable safety rules and regulations.
10. At all times relevant hereto, plaintiff worked for Blythe as the foreman on the job site. Plaintiff was responsible for supervising the laborers who worked under him on the job site. He was also responsible for ensuring their safety and his own.
11. Plaintiff testified that prior to starting work on this job site he told his supervisor at Blythe that he had no experience disassembling a bridge deck, but never told anyone at NCDOT or the KCA inspector on site that he had no experience disassembling a bridge deck. However, plaintiff did have previous experience building bridges, and had been the lead man on several projects and had lifted flat slabs of concrete before.
12. As part of the plans submitted to Blythe, there were instructions that the bridge deck should be removed by sawing sections between the beams and not allow any part of the structure to fall to the highway below. The plans further directed the general contractor to submit to NCDOT for approval its detailed method of structure removal prior to beginning work.
13. In response, Blythe submitted a letter to Brian Smith, NCDOT's Resident Engineer on this project, detailing Blythe's method of structure removal. It provided that "[t]he deck spans over Bus. I-85 will be removed by full depth saw cutting the deck slab at locations shown on the attached sketch. Before sawing a panel four (4) lift holes will be drilled in each panel and a crane with four way cable spreaders attached to hold and lift the panel out of the deck." (Hereinafter referred to as the "four pin method.")
14. Work began on the job site on Monday night, January 15, 2001. Plaintiff testified that on that night he took three safety harnesses onto the bridge deck for use by him and his workers. He was instructed by his supervisor with Blythe not to wear the safety harnesses because it would be more dangerous to wear them while doing this type of work.
15. Plaintiff never discussed the issue of safety harnesses with the KCA inspector or anyone at NCDOT.
16. Plaintiff attended safety meetings while at Blythe which included fall protection training and the use of safety harnesses. Plaintiff testified that he had not received any specific training for this project. However, on January 8, 2001, plaintiff signed a Fall Protection Training Certificate, wherein he certified that he had been trained in fall hazards associated with this project (defendant's Exh. 1).
17. Dennis Mise, the crane operator on the job site, testified that Blythe held safety meetings every Monday concerning issues that might arise on a job site.
18. Plaintiff's expert Albert Weaver testified that the best method of fall protection for this job site in his opinion was utilization of a safety harness and static line. However, he stated that if the contractor determined that such measures would not be feasible on this job site, then it could adopt alternative measures under OSHA such as a controlled access zone.
19. Mr. Weaver had no personal experience inspecting a bridge disassembly project, particularly with regard to fall protection.
20. There was no evidence presented as to whether or not an alternative fall protection plan was in place on the job site as allowed under OSHA and explained by Mr. Weaver. There was no evidence regarding whether or not a fall protection plan was in place on the job site and if so, whether it met the requirements of OSHA.
21. Although unclear, it appears that on the first night of this project, January 15, 2001, one panel may have been removed from the bridge deck using the four pin method as the saw operator was having trouble with his saw.
22. The second and third nights on the job site, January 16-17, 2001, a few additional panels were removed using the four pin method. However, the saw operator continued to experience difficulty with his saw and plaintiff testified that the cables connected to the concrete slab were in the way of the saw operator.
23. In an effort to progress at a faster rate, plaintiff contrived a new method of removing the panels drilling only two holes in the concrete panel. According to plaintiff's design, the concrete cutter was to cut six feet of the ten foot lengthwise panel and leave the last four feet uncut. Thereafter, plaintiff would then hook two pins up to the detached end of the panel and tension it up with a crane. At that point, plaintiff would get the ramhoe and bust little holes in between the rebar, have a crane lift up the panel so that others under his control could use a torch to cut the rebar, and let the panel swing out. (Hereinafter referred to as the "two pin method.")
24. Plaintiff testified that he tried this new two pin method on the last panel removed on Tuesday night, January 16, 2001 and did not return to work again until Monday night, January 22, 2001. However, the inspector's daily reports indicate that plaintiff worked at the job site on Wednesday night, January 17, 2001. Plaintiff thereafter agreed with the inspector's daily report.
25. It is unclear when plaintiff first tried this new two pin method. Plaintiff testified that although he was unclear of the day, he was certain that he tried out this new two pin method the last night he worked prior to the date of the accident.
26. Plaintiff further claims that after he tried this new method, he reported it to his supervisor at Blythe and that his supervisor at Blythe approved it.
27. Plaintiff could not specifically recall telling the KCA inspector on site about the new two pin method; however, plaintiff testified that he generally would check with Mr. Horton regarding changes on the job site and therefore, he must have told him about this new method.
28. Mr. Horton testified that he did not remember plaintiff telling him about this new two pin method and that if plaintiff had told him he would have noted it in his daily report. Mr. Horton further testified that if plaintiff had told him about this new method, he would have told plaintiff to submit it in writing so that he could forward it on to NCDOT for approval. Mr. Horton did not have the authority to approve such a change.
29. There is no evidence that anyone at NCDOT knew anything about a change in the method of bridge removal from what had previously been approved.
30. On the night of his accident, Monday, January 22, 2001, plaintiff was using this new two pin method of removal.
31. Monday, January 22, 2001, was the second saw operator's first night on the job following the firing by Blythe of the first saw operator the previous week.
32. At approximately 11:00 that evening, plaintiff and his other workers took their dinner break while the concrete saw operator continued working without supervision.
33. When Plaintiff returned from his break he realized that one of the holes in the panel that they had been working on prior to the break still had rebar inside of it, and that the pin to hook it up to the crane would not fit. Plaintiff instructed one of his laborers, Michael Becker, to drill another hole rather than use the torch to cut out the rebar.
34. When the ninety pound rockhammer drill busted through the concrete, it jarred the panel loose, causing it, Michael Becker and plaintiff to fall.
35. It appears from pictures of the bridge and plaintiff's testimony that the saw operator cut the entire ten feet of the panel rather than the six feet specified by plaintiff.
36. Despite having checked the cuts earlier in the evening, plaintiff failed to check the saw operator's cuts after returning from his break offsite. Plaintiff was aware that the saw operator was sawing on this panel at the time plaintiff left for his break.
37. When asked at his deposition why he did not check the cuts, plaintiff testified "Stupid, I guess." He explained that he got lulled into a sense of security because everything else was going so well. Plaintiff stated that if he had checked the cuts, "we wouldn't be here."
38. Prior to drilling the new hole, no one determined how the panel of concrete had been cut and whether or not it was cut correctly.
39. Plaintiff's expert Michael Rush, who had approximately fifteen years experience in saw cutting bridges, as a saw operator and supervisor, testified that no employee should step on a piece of concrete that was being cut.
40. The incident in question was caused by the fact that an employee was on a piece of concrete which was being cut, drilling with a ninety pound rockhammer drill.
41. Plaintiff worked on this job site for approximately four days. There is no evidence that the named negligent employee, Brian Smith, was present on this job site any of those days or that he had a duty to do so.
42. There is no evidence that Mr. Smith had any knowledge that plaintiff was not wearing a safety harness or that there was not an adequate fall protection plan on the job site.
43. There is no evidence that Mr. Smith was aware of or should have been aware of plaintiff's purported lack of training.
44. There was no evidence presented regarding what it is that Mr. Smith should have or should not have done.
45. Plaintiff failed to produce any evidence of notice on the part of the named employee of defendant.
46. Plaintiff was responsible for safety of himself and the other laborers, and was negligent in failing to check the cuts made by the saw operator prior to stepping on a piece of concrete that was being cut.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In order to sustain a compensable claim for damages under the Tort Claims Act, plaintiff must show that the injuries sustained were the proximate result of a negligent act of a named state employee. See N.C. Gen. Stat. § 143-291.
2. "When inherently dangerous activities are involved, any liability by the employer is governed by principles of negligence." Kinsey v. Spann,139 N.C. App. 370, 375, 433 S.E.2d 487, 491 (2000) citing Woodson v.Rowland, 329 N.C. 330, 350, 407 S.E.2d 222, 234 (1991). An activity is characterized as inherently dangerous if it can be performed safely provided certain precautions are taken, but will, in the ordinary course of events, cause injury to others if these precautions are omitted.Simmons v. NCDOT, 128 N.C. App. 402, 496 S.E.2d 790 (1998). The work of disassembling a bridge is an inherently dangerous activity. Therefore, NCDOT owed plaintiff a duty to exercise reasonable care in providing him with a safe work environment. Simmons, 128 N.C. App. 402, 407,496 S.E.2d 790, 794 (1998).
3. Although an inherently dangerous activity requires an elevated duty of care by the employer, "it is the negligence of the employer, not the independent contractor, that must be considered; liability is direct, not vicarious, in nature" when inherently dangerous activities are involved.Kinsey v. Spann, 139 N.C. App. 370, 375, 433 S.E.2d 487, 491 (2000). "[L]iability will attach only if the employer failed to take necessary precautions." Id. citing Woodson, 329 N.C. at 352, 407 S.E.2d at 235. In this case, plaintiff failed to show that an employee of NCDOT breached its duty of care to the plaintiff.
3. Even if negligence could be found on the part of defendant, plaintiff is barred from recovery as he was contributorily negligent. Hallv. Kmart, 136 N.C. App. 839, 525 S.E.2d 837 (2000).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Pursuant to N.C. Gen. Stat. § 1A-1, Rule 41(b), Defendant's Motion to Dismiss Plaintiff's claim with prejudice is GRANTED.
2. Each side shall bear its own costs.
This the ___ day of December, 2004.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER