JAMES HYLTON, PLAINTIFF v. HANESBRANDS, INC., DEFENDANT

No. COA10-1442

(Filed 6 September 2011)

**11. Landlord and Tenant—liability of landlord—injury to tenant's employee—control of premises**

The trial court properly granted summary judgment for defendant where an employee of a power company (plaintiff) was injured while operating a front-end loader at a steam plant that was leased by plaintiff's employer (Suez) from defendant. The Steam Agreement, which included the lease, did not provide evidence that defendant retained sufficient control of the premises to establish a duty to plaintiff.

**2. Negligence—industrial plant—subcontractor—collateral acts**

Although there was an issue as to whether an injured plaintiff's operation of a front-end loader was an inherently dangerous activity, it was undisputed that an agreement specifically stated that the relationship of plaintiff's employer (Suez) to defendant (the owner of the site) was that of a subcontractor that made the decisions as to how to provide the product (steam for a textile plant). Therefore, the nature of the site and its lighting were collateral to providing steam and no recovery was allowed.

HYLTON v. HANESBRANDS, INC.

[215 N.C. App. 295 (2011)]

Appeal by plaintiff from order entered 16 August 2010 by Judge Edwin G. Wilson, Jr. in Superior Court, Forsyth County. Heard in the Court of Appeals 10 May 2011.

*Benson Brown & Faucher, PLLC, by Drew Brown and James R. Faucher, for plaintiff-appellant.*

*Womble Carlyle Sandridge & Rice, by Reid C. Adams, Jr., Rachel E. Daly and Jennifer B. Lyday, for defendant-appellee.*

STROUD, Judge.

James Hylton ("plaintiff") appeals from a trial court's order granting Hanesbrands, Inc.'s ("defendant") motion for summary judgment and dismissing his complaint. For the following reasons, we affirm the trial court's order.

## I. Background

On 14 September 2009, plaintiff filed a complaint against defendant Hanesbrands, Inc., Sara Lee Corporation, and National Textiles, L.L.C. in Superior Court, Forsyth County, alleging defendants' were negligent, in (1) failing to "keep, create, and maintain the property in a reasonably safe condition[;]" (2) failing to "warn persons present of hidden perils and unsafe conditions;" and (3) failing to "make reasonable inspections of the area in question and to correct unsafe conditions which such an inspection would have or did reveal[;]" and that this negligence was the direct and proximate cause of plaintiff's injuries that occurred when the front-end loader he was operating turned over and rolled down a large pile of sawdust. Specifically, plaintiff alleged that "[t]here were significant lighting issues and problems which existed in the area and which the defendant failed to correct despite the ability to do so." On or about 18 November 2009, defendants filed an answer to plaintiff's complaint, denying the allegations of negligence and raising several affirmative defenses. The parties filed two joint stipulations dismissing without prejudice plaintiff's claims against Sara Lee and National Textiles, on 10 December 2009 and 16 February 2010, respectively. On 2 July 2010, defendant Hanesbrands filed a motion for summary judgment, arguing that in 2006 when plaintiff's injuries occurred it was leasing the premises to Suez Energy pursuant to an agreement and had no control over "the maintenance of the lighting structures on the Premises" or "the operation of the Steam Plant" and were therefore "not liable for injuries to third parties" such as plaintiff. The affidavits, depositions, and documents filed tended to show that in 1995 Power Sources, Inc. ("Power

**HYLTON v. HANESBRANDS, INC.**

[215 N.C. App. 295 (2011)]

Sources") entered into a contract with Sara Lee Corporation ("the Steam Agreement") in which Power Sources agreed to sell steam to Sara Lee for use in its textile mill in Eden, North Carolina. As part of the Steam Agreement, Sara Lee leased a portion of its property in Eden to Power Sources for it to construct and operate a steam plan on that premises to provide steam for Sara Lee's mill. Suez Energy ("Suez") later succeeded Power Sources as lessee of the premises and owner/operator of the steam plant. Similarly, defendant took over Sara Lee's position as lessor of the premises. Plaintiff was an employee of Suez. On 21 September 2006, plaintiff was injured when the front-end loader he was operating overturned while he was backing it down a large pile of sawdust at night at the steam plant. On 16 August 2010, the trial court granted summary judgment for defendant, dismissing plaintiff's complaint. Plaintiff filed notice of appeal to this Court on 2 September 2010. On appeal, plaintiff argues that the trial court erred in granting defendant's motion for summary judgment as (1) defendant had possession or control of the premises and therefore owed a duty of reasonable care to plaintiff or in the alternative, (2) defendant "had a non-delegable duty to prevent harm from an inherently dangerous activity occurring on its land."

## II. Summary Judgment

### A. Standard of Review

We have stated that

> [s]ummary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.' N.C. Gen. Stat. § 1A-1, Rule 56(c). 'A trial court's grant of summary judgment receives *de novo* review on appeal, and evidence is viewed in the light most favorable to the non-moving party.' *Sturgill v. Ashe Memorial Hosp., Inc.*, 186 N.C. App. 624, 626, 652 S.E.2d 302, 304 (2007), *disc. review denied*, 362 N.C. 180, 658 S.E.2d 662 (2008).

*Mitchell, Brewer, Richardson, Adams, Burge & Boughman, PLLC v. Brewer*, ___ N.C. App. ___, ___, 705 S.E.2d 757, 764-65 (citation omitted), *disc. review denied*, ___ N.C. ___, 707 S.E.2d 243 (2011). We have further noted that

> [i]n a negligence claim, summary judgment is appropriate where the plaintiff's forecast of evidence is insufficient to support an

essential element of negligence. *See Patterson v. Pierce*, 115 N.C. App. 142, 143, 443 S.E.2d 770, 771, *disc. review denied*, 337 N.C. 803, 449 S.E.2d 749 (1994). In order to establish a *prima facie* case for negligence, the plaintiff must show the following essential elements: (1) the defendant owed the plaintiff a duty of care; (2) the defendant's conduct breached that duty; (3) the breach was the actual and proximate cause of the plaintiff's injury; and (4) plaintiff suffered damages as a result of the injury. *See id.* at 144, 443 S.E.2d at 772.

*Vares v. Vares*, 154 N.C. App. 83, 87, 571 S.E.2d 612, 615 (2002), *disc. review denied*, 357 N.C. 67, 579 S.E.2d 576 (2003). "If it is shown the defendant had no duty of care to the plaintiff, summary judgment is appropriate." *Walden v. Morgan*, 179 N.C. App. 673, 680, 635 S.E.2d 616, 622 (2006) (quotation marks, brackets, and citations omitted).

B.  Analysis

Plaintiff contends that defendant owed a duty of reasonable care to him to maintain the premises because certain terms in the Steam Agreement establish that defendant "maintained possession and control of the premises it lease[d] to Suez[.]"

1.  Sufficient Control

**[1]** We have noted that "[i]t is a well established common law principle that a landlord who has neither possession nor control of the leased premises is not liable for injuries to third persons." *Vera v. Five Crow Promotions, Inc.*, 130 N.C. App. 645, 650, 503 S.E.2d 692, 696 (1998) (citation and quotation marks omitted). Plaintiff cites to *Holcomb v. Colonial Associates, LLC*, 358 N.C. 501, 597 S.E.2d 710 (2004) in support of his argument that defendant retained sufficient control of the premises by the terms of the Steam Agreement but distinguishes *McCorkle v. North Point Chrysler Jeep, Inc.*, ___ N.C. App. ___, 703 S.E.2d 750 (2010), which held that the terms of the landowner's contract were not sufficient to establish control. Plaintiff argues that the owner in *McCorkle* turned over "sole" control of the premises to the contractor but here defendant retained some control over the premises sufficient to establish a duty to plaintiff. Defendant counters that the terms of the Steam Agreement were dissimilar to the terms in the lease contract in *Holcomb* and that this case is more similar to the contracts in *McCorkle* and *Walden v. Morgan*, 179 N.C. App. 673, 635 S.E.2d 616, where the Courts found that the terms in those contracts were not sufficient to establish control by the landowner or a duty to the plaintiff.

In *Holcomb*, the plaintiff was injured by dogs owned by the landlord's tenant and the plaintiff filed a negligence claim against the landowner and the tenant. 358 N.C. at 503-04, 597 S.E.2d at 712-13. After this Court reversed the jury verdict in favor of the plaintiff, the plaintiff appealed to our Supreme Court. *Id.* at 504-05, 597 S.E.2d at 713-14. The Court noted that "a landlord owes a duty to third parties for conditions over which he retained control." *Id.* at 508, 597 S.E.2d at 715. The Court further noted that the lease between the landowner and tenant "required the tenant to 'remove any pet . . . within forty-eight hours of written notification from the landlord that the pet, in the landlord's sole judgment, creates a nuisance or disturbance or is, in the landlord's opinion, undesirable.' " *Id.* In affirming the jury's verdict and reversing this Court's ruling, the Court concluded that because the "landlord and tenant contractually agreed that landlord would retain control over tenant's dogs[,]" the condition that caused the plaintiff's injuries, "[t]his lease provision granted [the landlord] and [the management company] sufficient control to remove the danger posed by [the tenant's] dogs." *Id.* at 508-09, 597 S.E.2d at 715.

In *Walden*, this Court, in distinguishing *Holcomb*, held that the landowner's lease with his tenant, which operated a gas station on the leased premises, was insufficient to establish that plaintiff had sufficient control of the leased premises so that it owed the plaintiffs a duty of care. 179 N.C. App. at 682-83, 635 S.E.2d at 623. In *Walden*, the plaintiffs' real property was damaged by a gasoline explosion at the tenant's gas station and the plaintiffs brought a negligence claim against the landowner. *Id.* at 675-76, 635 S.E.2d at 619. On the plaintiffs' appeal from a trial court's order granting the landowner's motion for summary judgment, the plaintiffs, citing *Holcomb*, made the following argument before this Court:

> [the landowner] owed them a duty of care because it retained control over the property through the lease agreement with [the tenant]. Paragraph 3 of the lease states [the tenant] will, "b. Not use the premises for any unlawful or immoral purposes or occupy them in such a way as to constitute a nuisance . . . ." Plaintiffs contend this lease provision requires [the landowner] to prevent or stop any nuisance and "to take precautions to protect plaintiffs from harm."

*Id.* at 682, 635 S.E.2d at 623. In distinguishing *Holcomb* and overruling the plaintiffs' argument, the Court stated

[the landowner's] lease provision does not provide it control over the premises. In *Holcomb*, the landlord could remove any pet within forty-eight hours. 358 N.C. at 508-09, 597 S.E.2d at 715. Under section 7 of its lease with [the tenant], [the landowner] could only re-enter the property upon sixty days prior notice of default for a non-monetary lease provision. In *Holcomb*, the lease provision addressed the issue of liability and a third party was injured. 358 N.C. at 508-09, 597 S.E.2d at 715. The lease provision before us is too broad and indefinite to create liability for negligence for [the landowner's] failure to exercise control over the premises. This lease governs the business relationship between [the landowner] and [the tenant], not [the landowner] and [the gasoline supplier]. Under the lease, [the tenant] possessed the right to "[u]se the premises for purposes in keeping with the proper zoning." [The zoning official's] affidavit showed the convenience store was operating in compliance with applicable zoning regulations.

*Id.* at 682-83, 635 S.E.2d at 623.

Likewise in *McCorkle*, this Court recently addressed the issue of a landowner's control of a construction site and held that the landowner did not retain sufficient control of the construction site via the contract to establish a duty to a third party subcontractor. ___ N.C. App. at ___, 703 S.E.2d at 754. In *McCorkle*, the landowner, a car dealership, contracted with the contractor to construct a building on its premises and the plaintiff, an employee of a painting subcontractor, was injured when he "was walking down a stairway in the newly constructed building when a handrail broke[.]" *Id.* at ___, 703 S.E.2d at 751. The plaintiff filed a complaint alleging that the landowner "was negligent in failing to keep the construction site 'in reasonably safe condition.'" *Id.* On appeal from the trial court's granting the landowner's motion for summary judgment dismissing the plaintiff's claims, the plaintiff argued to this Court that the "Defendant, as a landowner, owed to Plaintiff the duty of reasonable care, which includes the duty to make a reasonable inspection of the construction site[.]" *Id.* at ___, 703 S.E.2d at 752. The Court noted the general rule that "an independent contractor and his employees who go upon the premises of an owner, at the owner's request, are lawful visitors and are owed a duty of due care[,]" and that "[t]his duty also requires a landowner, as well as a general contractor, to make a reasonable inspection to ascertain the existence of hidden dangers." *Id.* (citations omitted). The Court went on to note the following exception:

**HYLTON v. HANESBRANDS, INC.**

[215 N.C. App. 295 (2011)]

"an owner or occupier of land who hires an independent contractor is not required to take reasonable precautions against dangers which may be incident to the work undertaken by the independent contractor." *Id.* at ___, 703 S.E.2d at 753 (citations and quotation marks omitted). The Court explained that the "reason for the exception is that if a landowner relinquishes control and possession of property to a contractor, the duty of care, and the concomitant liability for breach of that duty, are also relinquished and should shift to the independent contractor who is exercising control and possession[,]" and "the exception itself, extends only as far as the independent contractor, and not the landowner, is in control of the hazard or danger." *Id.* (citations and quotation marks omitted). The Court went on to apply this exception to the facts:

> In this case, [the landowner] contracted with [the contractor] so that possession and control of the construction site were vested solely with [the contractor]. Under the terms of the contract, [the contractor] was to "supervise and direct the [w]ork, using [the contractor's] best skill and attention." [The contractor] was "solely responsible for and [had] control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the [w]ork under the Contract[.]" [The contractor] was further charged with responsibility for "inspection of portions of [w]ork already performed to determine that such portions are in proper condition to receive subsequent [w]ork."
>
> With respect to safety, [the contractor] was responsible "for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the [c]ontract." Further, [the contractor] was to "take reasonable precautions for safety of, and [] provide reasonable protection to prevent damage, injury or loss to" "employees . . . and other persons who may be affected thereby" and to "the [w]ork and materials and equipment to be incorporated therein, whether in storage on or off the site, under care, custody or control of [the contractor] or [the contractor's] [s]ubcontractors or [s]ub-subcontractors[.]"
>
> Based on the foregoing, it is clear that, contractually, [the contractor] was in control of the construction site. Further, the only evidence presented by Plaintiff to indicate that [the landowner] actually exercised any control over the construction was in Plaintiff's affidavit, in which Plaintiff stated that, at sometime before the accident, he observed a person, who was report-

edly an executive of [the landowner], on the stairway on which Plaintiff was injured. However, the mere fact that an employee of [the landowner] visited or toured the construction site is insufficient to show that Defendant retained any control of the construction site.

*Id.* at ___, 703 S.E.2d at 754. The Court then concluded "that [the landowner] was not in possession and control of the construction site such that it would be improvident to impose the duty of reasonable care and inspection on [the landowner]." *Id.*

Accordingly, we must determine whether the terms of the Steam Agreement were sufficient for defendant to be "in control of the hazard or danger[,]" *see McCorkle*, ___ N.C. App. at ___, 703 S.E.2d at 753, or to retain control over the condition that caused the plaintiff's injuries. *See Holcomb*, 358 N.C. at 508-09, 597 S.E.2d at 715. Plaintiff, in alleging that defendant failed to maintain the premises in a safe condition, warn of hidden dangers, or make a reasonable inspection of the premises, specifically alleged that "[t]here were significant lighting issues and problems which existed in the area and which the defendant failed to correct despite the ability to do so." In support of this allegation, plaintiff testified in his deposition that while building a road using a front-end loader on a large sawdust pile, he got to the top of the pile; he began backing back down the pile but because it was dark and there was inadequate lighting around the sawdust pile he could not see where he was backing; the front-end loader he was operating began to slide off of the side of the road, as the road collapsed; and the loader then flipped over and rolled down the sawdust pile, causing plaintiff's injuries. Therefore, the specific "hazard or danger[,]" *see McCorkle*, ___ N.C. App. at ___, 703 S.E.2d at 753, arose from the safety issues posed by the piles of sawdust and the inadequate lighting. Therefore, we look to the Steam Agreement to see the extent of defendant's control as to these conditions on the leased property in question.

Turning to the terms of the Steam Agreement, it appears that this is merely a "mutual covenant[]" between Suez's predecessor in interest to provide steam and defendant's predecessor to provide land for a steam facility and to buy their steam exclusively from that predecessor. The Steam Agreement specifically addresses *inter alia* the facilities that would be built to supply that steam, details surrounding the amount and type of steam required, and specific information regarding payment for the steam. However, plaintiff points to six sep-

arate portions of the Steam Agreement in which he argues are evidence that defendant retained sufficient control of the premises to establish a duty to plaintiff. We will address each individually.

Plaintiff first contends this portion of the Steam Agreement demonstrates aspects of defendant's control of the leased premises:

> 7.3 [Suez] shall allow [defendant] reasonable access, as deemed necessary by [defendant], to the Site and Boiler Facility.

We fail to see how this portion of the agreement has anything to do with safety on the premises, control of the lighting on the premises, or the size of the sawdust pile, "the hazard[s] or danger[s,]" *see McCorkle*, __ N.C. App. at ___, 703 S.E.2d at 753, that contributed to plaintiff's injuries. Plaintiff cites no case law for the proposition that a lessor with reasonable access to leased property can be liable for injuries to a third party that occurred on that leased property just because of that access.

Plaintiff next points us to another portion of the Steam Agreement in Section 7:

> 7.4 [Suez] shall allow [defendant] to inspect and review operational and maintenance procedures as needed to convince [defendant] that the Boiler Facility is operated using good standard practices and that the Boiler Facility is kept in good condition.

Although this portion of the agreement mentions "good standard practices" it could very well be addressing defendant's inspection of Suez's premises for compliance with government regulations as much as it could be for an inspection of safety. At most it gives defendant the right to inspect Suez's facilities but no immediate right of correction, unlike the terms in the *Holcomb* lease, which allowed the landowner to remove the dog within 48 hours if he deemed the animal to be "undesirable." 358 N.C. at 508, 597 S.E.2d at 715. As this Court noted in *Walden*, this provision is "too broad and indefinite to create liability for negligence" 179 N.C. App. at 683, 635 S.E.2d at 623, or to establish that defendant had control of the safety issues that plaintiff alleged at the Suez premises.

Plaintiff next points to the following portions of the agreement:

> 9.3 [Suez] shall take all necessary measures to assure that when its employees, contractors, or representatives are present at the [defendant's] Facility, they will comply with [defendant's] rules, policies and customary practices governing safety; cutting, weld-

ing, and brazing; identification badges; plant security; and other personnel activities.

9.4 All work to be performed by [Suez] at [defendant's] Facility must be scheduled in advance with engineering personnel, and all restoration work at that facility must meet with [defendant's] approval.

As plaintiff's complaint addresses defendant's control of Suez's premises, portions of the Steam Agreement governing how Suez employees should perform when at defendant's facility are irrelevant to the issues before us.

Plaintiff further points to the following provisions of the Steam Agreement:

4.3 [Defendant] shall provide access to the Boiler Facility by an access road from public roads or through [defendant's] facility.

This provision does not control any aspect of Suez's operation of the steam plant on the premises but merely states that defendant is to provide Suez with an access road to the Suez facility. Finally, plaintiff points to this portion of the Steam Agreement:

20.4 Wood Fuel. [Suez] shall procure wood fuel in sufficient quantity and proper form, to provide fuel for [defendant's] gasifiers. All procurement costs shall be to [Suez's] account. The cost of the fuel, delivered to the Boiler Facility, shall be to [defendant's] account. [Defendant] shall have the right to approve or reject any wood fuel suppliers, and shall have the right to review all files and procedures associated with wood fuel procurement.

Although this portion deals with the supply of wood to the "Boiler Facility" on Suez's premises, it makes no requirements or directions as to how the wood is to be stored or regarding lighting around that wood supply. Even in the aggregate, these specific portions tend to demonstrate that the Steam Agreement left the specifics of operating the steam facility to Suez's discretion.

Plaintiff's argument also ignores portions of the Steam Agreement which demonstrate that the detailed operation of the steam facility on Suez's premises and issues of safety were in exclusive control of Suez. In Section 2 the agreement states that Suez will operate a facility comprising of "[f]acilities for the storage and handling of the wood fuel and other materials[;]" maintain "[a]ll . . . safety, traffic control and security equipment and services as required

by law[,]" and "[a]ll access roads, drainage and lighting structures[;] and "keep the Boiler Facility neat, clean, and well-maintained[.]" Based on the foregoing, it is clear that, contractually, Suez was in exclusive control of the safety issue alleged by plaintiff. *See McCorkle*, ___ N.C. App. at ___, 703 S.E.2d at 754. Plaintiff also argues that the Steam Agreement "is ambiguous as to the degree of control retained by" defendant thus the interpretation of the contract is for the jury to determine. However, given the above portions of the Steam Agreement, we do not find the Steam Agreement to be ambiguous as to control of the safety issues regarding the Suez facility as plaintiff alleged. Accordingly, plaintiff's argument is overruled.

2. Inherently Dangerous

**[2]** As noted above, plaintiff also argues in the alternative that defendant owed plaintiff a duty of care as "operating heavy machinery at night without sufficient lighting, is inherently dangerous[,]" and defendant's representatives were aware or should have been aware "of the lack of adequate lighting." This Court in *Hooper v. Pizzagalli Constr. Co.*, addressed the issue of inherently dangerous activities in the context of work performed by an independent contractor, noting that

> "[o]ne who employs an independent contractor to perform an inherently dangerous activity may not delegate to the independent contractor the duty to provide for the safety of others[.]" [*Woodsen v. Rowland*, 329 N.C. 330, 352, 407 S.E.2d 222, 235 (1991)]. An inherently dangerous activity is defined as work to be done from which mischievous consequences will arise unless preventative measures are adopted, *Greer v. Construction Co.*, 190 N.C. 632, 130 S.E. 739 (1925), and that which has "a recognizable and substantial danger inherent in the work, as distinguished from a danger collaterally created by the independent negligence of the contractor, which later might take place on a job itself involving no inherent danger." *Woodson*, 329 N.C. at 351, 407 S.E.2d at 234.

In the instant case, the record reveals that Acme was hired to perform plumbing work. At the time of the accident, the decedent was working on a valve located on the seventh floor interstitial area of the project. The record reveals that the decedent and his co-worker Rigsbee used a scaffold to better reach the valve. The decedent and Rigsbee stood on the scaffold thirteen feet off the ground and did not properly secure the scaffold board or take any other precautions. Use of a scaffold in conjunction with the

plumbing work was not set out in the contract. As a result, use of the scaffold by the decedent and Rigsbee was totally collateral to the work as contracted. No recovery may be allowed for an injury resulting from an act or fault purely collateral to the work and which arises entirely from the wrongful act of the independent contractor or his employees. *Evans v. Elliott*, 220 N.C. 253, 259, 17 S.E.2d 125, 128 (1941); *Goolsby v. Kenney*, 545 S.W.2d 591, 594 (1976).

112 N.C. App. 400, 405-06, 436 S.E.2d 145, 148-49 (1993), *disc. review denied*, 335 N.C. 770, 442 S.E.2d 516 (1994). Here, there is an issue as to whether plaintiff's operation of the front-end loader was an inherently dangerous activity. Plaintiff admitted in his deposition that prior to his accident he had safely deposited sawdust on various sawdust piles "a couple hundred" times per eight hour shift since 2003 when he started working at the steam plant, and plaintiff was not aware of any other Suez employee who was injured while depositing sawdust on Suez's premises. Without reaching this issue, it is undisputed that the Steam Agreement specifically states that Suez's relation to defendant is as its subcontractor to provide steam for defendant's facility. Therefore, Suez contracted to provide steam and Suez made the decision as to how to provide that steam, which included constructing large piles of sawdust in a particular location that had poor lighting. Therefore, the nature of the sawdust piles and the lighting were actions that were collateral to providing steam, and as noted above, "[n]o recovery may be allowed for an injury resulting from an act or fault purely collateral to the work and which arises entirely from the wrongful act of the independent contractor or his employees." *See id.* Accordingly, we are not persuaded by plaintiff's argument. For the foregoing reasons, we affirm the trial court's order.

AFFIRMED.

Judges McGEE and BEASLEY concur.