IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA15-751

Filed: 17 May 2016

Robeson County, No. 12 CVS 1673

BRIAN BLUE, Plaintiff,

v.

MOUNTAIRE FARMS, INC., MOUNTAIRE FARMS OF NORTH CAROLINA CORP., MOUNTAIRE FARMS, LLC, CHARLES BRANTON, DANIEL PATE, JAMES LANIER, ROBERT GARROUTTE, a/k/a ROBERT GARROUTTE, JR., CHRISTOPHER SMITH, HALLEY ONDONA, THOMAS SAUFLEY, DETRA SWAIN, As Executrix of the Estate of Clifton Swain, THE ESTATE OF CLIFTON SWAIN, and BRADFORD SCOTT HANCOX, Public Administrator of Cumberland County, North Carolina, and as Successor or substitute Personal Representative And/or Administrator And/or Collector of the Estate of Clifton Swain, Defendants.

Appeal by defendants and cross-appeal by plaintiff from order entered 31 December 2014 by Judge James Gregory Bell in Robeson County Superior Court. Heard in the Court of Appeals 30 November 2015.

*Smith Moore Leatherwood LLP, by Lisa W. Arthur and Lisa K. Shortt, for defendants.*

*Pinto Coates Kyre & Bowers, PLLC, by Jon Ward, Paul D. Coates, and Adam L. White, A.G. Linett & Associates, P.A., by Adam G. Linett and J. Rodrigo Pocasangre, for plaintiff.*

DAVIS, Judge.

This appeal arises out of a tragic accident involving the release of ammonia at a poultry processing plant in which Brian Blue ("Plaintiff") was severely injured and a co-worker, Clifton Swain ("Swain"), was killed. In his lawsuit, Plaintiff asserted

*Woodson*[1] claims against Defendants Mountaire Farms, Inc. ("Mountaire Farms"), Mountaire Farms of North Carolina Corp., and Mountaire Farms, LLC (collectively "the Mountaire Defendants"). Plaintiff also asserted *Pleasant*[2] claims against Charles Branton; Daniel Pate; James Lanier;[3] Robert Garroutte, a/k/a Robert Garroutte, Jr.; Christopher Smith; Halley Ondona; Thomas Saufley; Detra Swain, as executrix of the Estate of Clifton Swain; the Estate of Clifton Swain; and Bradford Scott Hancox, public administrator of Cumberland County, North Carolina, and as successor or substitute personal representative and/or administrator and/or collector of the Estate of Clifton Swain (collectively "the Individual Defendants").

All of the Defendants appeal from the trial court's order denying their motion for summary judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure. Plaintiff cross-appeals from the trial court's denial of his motion for summary judgment as to Defendants' affirmative defense of contributory negligence. After careful review, we reverse the trial court's denial of Defendants' motion for

---

[1] *Woodson v. Rowland*, 329 N.C. 330, 407 S.E.2d 222 (1991).

[2] *Pleasant v. Johnson*, 312 N.C. 710, 325 S.E.2d 244 (1985).

[3] While both Plaintiff's complaint and the caption of the trial court's order from which this appeal arises lists James Lanier as a defendant, the record does not contain any indication that an individual by this name was employed by the Mountaire Defendants at any time relevant to the events giving rise to this appeal. Nor do the parties reference anyone by this name in their briefs to this Court. The record also fails to show that service of process was ever made on this defendant, and no responsive pleading was filed on his behalf.

summary judgment and remand for entry of summary judgment in favor of Defendants on all claims.

## Factual Background

Mountaire Farms is a poultry processing plant located in Robeson County, North Carolina. As part of its business, Mountaire Farms utilizes anhydrous ammonia refrigeration to maintain the temperature of its poultry. This is accomplished, in part, through the use of machinery called "votators,"[4] which encase the ammonia.

At all times relevant to this appeal, Mountaire Farms' Engineering and Maintenance Department was responsible for overseeing the day-to-day operation and upkeep of the plant. The head of the department was Halley Ondona ("Ondona"). Christopher Smith ("Smith"), the maintenance manager, reported to Ondona. Robert Garroutte ("Garroutte"), the processing maintenance manager, in turn, reported to Smith. Below Garroutte was Jim Laird, the second processing area manager, who supervised several second processing shift superintendents, including Charles Branton ("Branton"). Thomas Saufley ("Saufley") was Mountaire Farms' safety and health manager who was in charge of overseeing its safety program. Daniel Pate

---

[4] The manufacturer's manual explains that votators "are scraped surface heat exchangers with jacketed shell pressure vessels. The jacket around the ingredient area of the vessel allows for ammonia cooling of the product medium to the desired temperature prior to packaging."

("Pate") was Mountaire Farms' second processing maintenance superintendent, who oversaw the operations of the second processing operation.

The second processing operation was divided into two separate departments — the refrigeration department and the maintenance department. The refrigeration department was comprised of mechanics who dealt with any maintenance tasks at the plant involving ammonia. The maintenance department, in turn, handled non-refrigeration maintenance tasks. When the maintenance department was required to perform maintenance on equipment containing ammonia, the refrigeration department was typically tasked with ensuring the ammonia was evacuated from the equipment prior to the maintenance department beginning its work.

Branton's job was to supervise the plant's maintenance mechanics. He was the direct supervisor of Swain, who was the mechanic in charge of performing maintenance on the plant's votators. Branton also supervised Plaintiff, a maintenance mechanic responsible for repairing and maintaining certain processing equipment at the plant. Both Plaintiff and Swain worked in the maintenance department rather than the refrigeration department.

On 1 April 2009, the United States Department of Agriculture ("the USDA") performed an inspection of the plant. As a result of this inspection, Mountaire Farms was ordered by the USDA to replace the inner sleeve of one of its votators.

In response to the USDA's findings, a new votator sleeve was ordered. Ondona, Smith, and Garroutte held several meetings to discuss whether the new votator sleeve could be installed by Mountaire Farms employees or, alternatively, whether independent contractors needed to be hired for the installation. Ultimately, it was determined that Mountaire Farms employees could perform the installation.[5]

The new votator sleeve arrived at the plant on Tuesday, 16 June 2009. Branton assigned the installation of the votator sleeve to Swain for the following weekend and inputted the corresponding work order on the Mountaire Maintenance Log — a spreadsheet that organized maintenance tasks to be performed and identified the mechanic who was responsible for completing each task. The maintenance log did not list any Mountaire Farms employee other than Swain in connection with the installation of the votator sleeve.

Prior to the installation, Branton provided Swain with selected pages of the manufacturer's operator's manual for the votator, which detailed the procedure for replacing the inner sleeve of a votator. The following warning was contained within these pages of the manual:

> **DANGER: Before removing the heat exchanger tube from the jacket, all refrigerant[6] must be evacuated**

---

[5] There is conflicting evidence in the record as to who specifically made the decision to use employees of Mountaire Farms to install the votator sleeve.

[6] An internal document prepared by Mountaire Farms and included in the exhibits to the record entitled "Specific Programs within the Written Compliance Plan" explains that "Mountaire Farms . . . utilizes Anhydrous Ammonia as a refrigerant coolant in its processing operation."

**from the jacket assembly.**

After Swain had reviewed these pages from the manual, Branton asked him "if he'd ever made the repair before . . . if there was gonna be a problem." Swain responded that he "didn't see a problem" with the assignment.

On the morning of Saturday, 20 June 2009, Branton met with the second processing shift mechanics he supervised — including Swain and Plaintiff — before they began work. During this meeting, Branton briefed the mechanics on their assigned tasks for the day based on the assignments previously entered in the maintenance log. Once again, Swain was the only employee mentioned with regard to the votator sleeve replacement.

Swain then began work on the votator sleeve project while Plaintiff performed other unrelated assignments in a separate area of the plant. Sometime later that morning, Swain called over the radio to request Plaintiff's assistance with the replacement of the votator sleeve. Plaintiff then "went over to see what [he] could do for [Swain.]"

As Plaintiff entered the room where Swain was working, Swain was in the process of unscrewing a valve on the votator. Branton was observing Swain's work from a position next to the ladder upon which Swain was standing. As he saw Swain unscrewing the valve, Plaintiff — who was aware of the fact that the votator contained ammonia and of the hazardous nature of ammonia — shouted at Swain:

"Stop Cliff, stop." However, his warning was too late as the pressure behind the partially opened votator sleeve forced ammonia out of the votator in an explosive manner, which caused the room to be filled with ammonia almost instantaneously.

Swain died as a result of his exposure to the ammonia, and Plaintiff and Branton were both seriously injured. Plaintiff's injuries left him in a coma for four to five months. He was also required to undergo a double lung transplant as a result of his exposure to the ammonia. Branton required hospitalization and was incapacitated for approximately forty days.

A subsequent investigation performed by the North Carolina Department of Environment and Natural Resources Division of Air Quality ("DAQ") found several violations by Mountaire Farms of its risk management and safety guidelines in connection with the accident. As a result, DAQ imposed a civil penalty against Mountaire Farms in the amount of $25,000.00. The North Carolina Occupational Safety and Health Review Commission performed its own investigation after the 20 June 2009 accident and assessed a penalty against Mountaire Farms in the amount of $33,950.00.

On 19 June 2012, Plaintiff filed a lawsuit in Robeson County Superior Court asserting a *Woodson* claim against the Mountaire Defendants as well as a *Pleasant* claim against each of the Individual Defendants. On 20 August 2012, all Defendants except for Garroutte and Ondona filed motions to dismiss Plaintiff's claims pursuant

to Rules 12(b)(1) and (6) of the North Carolina Rules of Civil Procedure. Garroutte and Ondona filed their own motions to dismiss on 31 August 2012 and 12 September 2012, respectively.

On 5 November 2012, Defendants' motions to dismiss were heard before the Honorable Mary Ann L. Tally. Judge Tally entered an order on 28 November 2012 denying the motions. Defendants filed an answer to the complaint on that same date.

On 23 June 2014, Plaintiff filed a motion for summary judgment as to the defense of contributory negligence, which was listed as an affirmative defense in Defendants' answer. Defendants filed a motion for summary judgment as to all claims contained in Plaintiff's complaint on 25 August 2014. Plaintiff voluntarily dismissed his claims against Mountaire Farms, LLC and Pate on 25 September 2014.

On 1 December 2014, the parties' summary judgment motions were heard before the Honorable James Gregory Bell. The trial court entered an order on 31 December 2014 denying both motions. On 12 January 2015, Defendants filed a notice of appeal, and on 15 January 2015, Plaintiff cross-appealed.

## Analysis

### I. Appellate Jurisdiction

As an initial matter, we note that Defendants' appeal is interlocutory. "[W]hether an appeal is interlocutory presents a jurisdictional issue, and this Court has an obligation to address the issue *sua sponte*." *Duval v. OM Hospitality, LLC*,

186 N.C. App. 390, 392, 651 S.E.2d 261, 263 (2007) (citation, quotation marks, and brackets omitted). "A final judgment is one which disposes of the cause as to all the parties, leaving nothing to be judicially determined between them in the trial court." *Id.* (citation omitted). Conversely, an order or judgment is interlocutory if it does not settle all of the issues in the case but rather "directs some further proceeding preliminary to the final decree." *Heavner v. Heavner*, 73 N.C. App. 331, 332, 326 S.E.2d 78, 80, *disc. review denied*, 313 N.C. 601, 330 S.E.2d 610 (1985).

Generally, there is no right of immediate appeal from an interlocutory order. *Paradigm Consultants, Ltd. v. Builders Mut. Ins. Co.*, 228 N.C. App. 314, 317, 745 S.E.2d 69, 72 (2013). The prohibition against appeals from interlocutory orders "prevents fragmentary, premature and unnecessary appeals by permitting the trial court to bring the case to final judgment before it is presented to the appellate courts." *Russell v. State Farm Ins. Co.*, 136 N.C. App. 798, 800, 526 S.E.2d 494, 496 (2000) (citation and brackets omitted).

> However, there are two avenues by which a party may immediately appeal an interlocutory order or judgment. First, if the order or judgment is final as to some but not all of the claims or parties, and the trial court certifies the case for appeal pursuant to N.C. Gen. Stat. § 1A-1, Rule 54(b), an immediate appeal will lie. Second, an appeal is permitted under N.C. Gen. Stat. §§ 1-277(a) and 7A-27(d)(1) if the trial court's decision deprives the appellant of a substantial right which would be lost absent immediate review.

*N.C. Dep't of Transp. v. Page*, 119 N.C. App. 730, 734, 460 S.E.2d 332, 334 (1995) (internal citations omitted).

This Court has held that a defendant's interlocutory appeal from the denial of a dispositive motion involving a *Woodson* claim affects a substantial right and is therefore immediately appealable. *See Edwards v. GE Lighting Systems, Inc.*, 193 N.C. App. 578, 581, 668 S.E.2d 114, 116 (2008) (holding that employer's appeal from denial of motion for summary judgment on *Woodson* claim was proper because denial of motion affected employer's substantial right of immunity from liability based on North Carolina Workers' Compensation Act).

This same principle applies equally to *Pleasant* claims as such claims are also an exception to the exclusivity of the Workers' Compensation Act. *See Bruno v. Concept Fabrics, Inc.*, 140 N.C. App. 81, 85, 535 S.E.2d 408, 411 (2000) ("Normally, the Workers' Compensation Act provides an exclusive remedy for an employee injured as a result of an on-the-job accident. Our Supreme Court held in *Pleasant*, however, that the Workers' Compensation Act does not shield a co-employee from liability for injury to another employee caused by willful, wanton and reckless negligence." (internal citations omitted)). Therefore, this Court possesses jurisdiction over both of the issues raised in Defendants' appeal.[7]

---

[7] Because we hold that Defendants' motion for summary judgment was improperly denied by the trial court, Plaintiff's cross-appeal is rendered moot and, therefore, we need not determine whether we possess jurisdiction to consider the cross-appeal. *See Sellers v. FMC Corp.*, 216 N.C. App. 134, 143,

## II. *Woodson* Claim

On appeal, the Mountaire Defendants argue that the trial court erred in denying their motion for summary judgment as to Plaintiff's *Woodson* claim. We agree.

> The standard of review relating to the granting or denial of a summary judgment motion is whether there is a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. In ruling on the motion, the court must consider the evidence in the light most favorable to the nonmovant, who is entitled to the benefit of all favorable inferences which may reasonably be drawn from the facts proffered. Summary judgment may be properly shown by proving that an essential element of the plaintiff's case is non-existent.

*JPMorgan Chase Bank, Nat'l Ass'n v. Browning*, 230 N.C. App. 537, 540-41, 750 S.E.2d 555, 559 (2013) (internal citations and quotation marks omitted). "When the denial of a summary judgment motion is properly before this Court . . . the standard of review is *de novo*." *Free Spirit Aviation, Inc. v. Rutherford Airport Auth.*, 191 N.C. App. 581, 583, 664 S.E.2d 8, 10 (2008).

As a general proposition, the North Carolina Workers' Compensation Act ("the Workers' Compensation Act") provides the exclusive remedy available to employees seeking relief for work-related injuries resulting from the acts or omissions of their employers. *See Wake Cty. Hosp. System, Inc. v. Safety Nat. Cas. Corp.*, 127 N.C. App.

---

716 S.E.2d 661, 667 (2011) ("Due to our above decision on plaintiff's appeal, we must dismiss defendant's issues on cross-appeal as moot . . . ."), *disc. review denied*, 366 N.C. 250, 731 S.E.2d 429 (2012). Defendants' motion to dismiss the cross-appeal is also denied as moot.

33, 40, 487 S.E.2d 789, 793 ("[T]he exclusivity provision of the Act precludes a claim for ordinary negligence, even when the employer's conduct constitutes willful or wanton negligence."), *disc. review denied*, 347 N.C. 410, 494 S.E.2d 600 (1997). We explained the rationale underlying this exclusive remedy in *Edwards*.

> The North Carolina Workers' Compensation Act grants employers who fall under the purview of the act immunity from suit for civil negligence actions. In exchange for this immunity, the Act imposes liability, including medical expenses and lost income, on employers for work-related injuries without the worker having to prove employer negligence or face affirmative defenses such as contributory negligence and the fellow servant rule.

*Edwards*, 193 N.C. App. at 582, 668 S.E.2d at 117 (internal citations, quotation marks, and brackets omitted).

In *Woodson*, our Supreme Court adopted a narrow exception to the exclusivity of the Workers' Compensation Act as a remedy for injuries in the workplace. The employer in *Woodson* was a construction company that specialized in trench excavation. *Woodson*, 329 N.C. at 334, 407 S.E.2d at 225. Acting in disregard of applicable safety regulations and the obvious danger of a potential cave-in, the company's president ordered his employees to work in a trench that had sheer, unstable walls and lacked proper shoring without the use of a trench box (despite the fact that one was available). *Id.* at 345-46, 407 S.E.2d at 231. One of the company's employees was killed when the trench in which he was working collapsed. *Id.* at 336, 407 S.E.2d at 226. The record revealed that the company had been cited at least four

times in the preceding six and a half years for violations of trenching safety regulations. *Id.* at 345, 407 S.E.2d at 231.

Based on these facts, our Supreme Court ruled that there was sufficient evidence from which "a reasonable juror could determine that upon placing a man in this trench serious injury or death as a result of a cave-in was a substantial certainty rather than an unforeseeable event, mere possibility, or even substantial probability." *Id.* The Court proceeded to hold that

> when an employer intentionally engages in misconduct knowing it is substantially certain to cause serious injury or death to employees and an employee is injured or killed by that misconduct, that employee, or the personal representative of the estate in case of death, may pursue a civil action against the employer. Such misconduct is tantamount to an intentional tort, and civil actions based thereon are not barred by the exclusivity provisions of the [Workers' Compensation] Act.

*Id.* at 340-41, 407 S.E.2d at 228.

The elements of a *Woodson* claim are: "(1) misconduct by the employer; (2) intentionally engaged in; (3) with the knowledge that the misconduct is substantially certain to cause serious injury or death to an employee; and (4) that employee is injured as a consequence of the misconduct." *Hamby v. Profile Products, LLC*, 197 N.C. App. 99, 106, 676 S.E.2d 594, 599 (2009) (citation and quotation marks omitted).

The Supreme Court has cautioned, however, that "[t]he *Woodson* exception represents a narrow holding in a fact-specific case, and its guidelines stand by

themselves. This exception applies only in the most egregious cases of employer misconduct. Such circumstances exist where there is uncontroverted evidence of the employer's intentional misconduct and where such misconduct is substantially certain to lead to the employee's serious injury or death." *Whitaker v. Town of Scotland Neck*, 357 N.C. 552, 557, 597 S.E.2d 665, 668 (2003). This Court has held that "*[w]illful and wanton negligence alone is not enough to establish a Woodson claim*; a higher degree of negligence is required. The conduct must be so egregious as to be tantamount to an intentional tort." *Shaw v. Goodyear Tire & Rubber Co.*, 225 N.C. App. 90, 101, 737 S.E.2d 168, 176 (citation omitted), *disc. review denied*, 367 N.C. 204, 748 S.E.2d 323 (2013).

In the present case, we conclude that the Mountaire Defendants were entitled to summary judgment on Plaintiff's *Woodson* claim for several reasons. First, and most basically, it is undisputed that Plaintiff was not assigned to perform any work at all regarding the votator sleeve installation. As the record makes clear, *Swain* was the sole employee who was assigned this task. At no point was Plaintiff ever ordered by a supervisor to assist Swain with the project, and Plaintiff never actually performed any work on the installation. Instead, Plaintiff merely entered the room where Swain was working and "[t]he accident happened before [Plaintiff] could get to him." Thus, Plaintiff's injury occurred only after he voluntarily chose to enter the room in which Swain was working in response to a request for assistance from Swain,

who did not occupy a supervisory position over Plaintiff. Moreover, Plaintiff's deposition testimony makes clear that he did not inform his supervisor of his intent to assist Swain.

> Q. So you went there in response to Mr. Swain's request; is that right?
>
> A. Yes, ma'am.
>
> Q. You never spoke to Mr. Branton about going in to help Mr. Swain?
>
> A. No, ma'am.

Consequently, the Mountaire Defendants did not place *Plaintiff* in danger in connection with the votator sleeve installation and, therefore, Plaintiff cannot establish a valid *Woodson* claim. In several prior cases, this Court has reached a similar conclusion where an employee engaged in a dangerous activity or placed himself in a dangerous area without first being instructed to do so by his employer. For example, in *Hamby*, the plaintiff was a truck-dump operator at a mulch company. On his own initiative, he decided to clear accumulated woodchips in an auger pit at his employer's plant that was used for grinding mulch. While doing so, he slipped and entangled his left leg in the augers, causing him to suffer serious injuries that ultimately required the amputation of his left leg above the knee. *Hamby*, 197 N.C. App. at 101, 676 S.E.2d at 596. The pit was found to be in violation of OSHA standards due to the fact that no protective guard rail surrounded it. The emergency

deactivation switch for the auger pit was also inoperable at the time of the plaintiff's accident such that the augers could not be immediately shut down. *Id.*

The plaintiff brought a *Woodson* claim against his employer, and the trial court granted the employer's motion for summary judgment. *Id.* at 105, 676 S.E.2d at 598. On appeal, we affirmed the trial court's entry of summary judgment in favor of the employer, holding as follows:

> Plaintiffs' forecast of evidence here shows that Hamby was injured by Terra-Mulch's inadequately guarded machinery — the rotating augers — in violation of OSHA standards. Our Supreme Court, however, [has] found this circumstance insufficient to establish a *Woodson* claim, even when coupled with an allegation that supervisors specifically directed the employee to work in the face of the hazard. *Plaintiffs' allegations and forecast of evidence in this case did not demonstrate that Hamby was specifically instructed to descend from the truck-dump operator platform in the manner that exposed him to the hazardous augers*, or that Terra-Mulch was otherwise substantially certain he would be seriously injured. Accordingly, we agree with the trial court that Plaintiffs' forecast of evidence at summary judgment was insufficient to establish their *Woodson* claim against Terra-Mulch.

*Id.* at 108, 676 S.E.2d at 600 (internal citations and quotation marks omitted and emphasis added).

In *Edwards*, an employee worked at his employer's plant, which manufactured industrial lighting through a process that "require[d] metal parts to be baked in annealing ovens in an oxygen-free gas which contains a high concentration of carbon monoxide." *Edwards*, 193 N.C. App. at 580, 668 S.E.2d at 115. The employee, an

annealing oven operator, was working overtime and decided to take a break, choosing to do so behind one of the annealing ovens. However, due to a leak emanating from the rear of the annealing oven, he was exposed to fatal levels of carbon monoxide, ultimately causing his death. *Id.*

The employee's estate brought a *Woodson* claim against the employer. The employer filed a motion for summary judgment, which was denied by the trial court. *Id.* at 580, 668 S.E.2d at 115-16. On appeal, this Court held that because the employee had acted on his own initiative, the elements of a *Woodson* claim were lacking. We reasoned that

> in contrast to *Woodson*, where the employer intentionally ordered the decedent to work in a known dangerous condition, in the instant case, decedent volunteered to work extra hours after his shift, and chose to take a break behind the annealing ovens, where the carbon monoxide concentration was very high. Although plaintiff contends that [the employer] could have done more to ensure its workers' safety, the evidence does not show that the employer engaged in misconduct *knowing* it was substantially certain to cause death or serious injury.

*Id.* at 584-85, 668 S.E.2d at 118 (citation, quotation marks, and brackets omitted).

The second primary reason why Plaintiff's *Woodson* claim fails as a matter of law is his inability to show knowledge on the part of the Mountaire Defendants that the attempt to replace the votator sleeve was substantially certain to cause serious injury or death. The evidence of record shows that Swain led his supervisor to believe that the installation of the votator sleeve could safely be performed. Swain informed

- 17 -

Branton after examining the excerpt from the operator's manual that he "didn't see a problem" with him performing the installation. This evidence belies the notion that Branton was on notice that Swain's installation of the votator sleeve was substantially certain to result in serious injury or death.

Plaintiff points to his own deposition testimony in which he stated that he had a conversation with Swain prior to the accident in which Plaintiff expressed his belief that Swain could not perform the installation himself and that mechanics from Mountaire Farms' refrigeration department needed to be involved. According to Plaintiff, Swain responded that he felt like he had no choice other than to perform the installation in order to keep his job. However, Plaintiff has failed to offer evidence that Plaintiff, Swain, or anyone else expressed concerns to management personnel at Mountaire Farms about Swain's alleged inability to safely perform the installation.

Branton testified that he was unaware of the dangers posed by the installation in terms of the potential for the release of ammonia from the votator. His lack of awareness of this danger was aptly demonstrated by the fact that he stood next to Swain while Swain was performing the installation. Indeed, Branton testified that he did not know that there was any risk at all of ammonia being released during the replacement of the votator sleeve and, therefore, his testimony shows that he lacked any basis for believing that the refrigeration department needed to be brought in to assist with the project.

Q. If you had noted that this involved exposure -- this involved an actual Ammonia exposure situation would you have signed [sic] this to Clifton Swain?

A. No.

Q. What would you have done?

A. Well, it would have -- I would have gotten touch [sic] with refrigeration if it was -- yeah. It would have been a -- refrigeration would have been responsible to drain the Ammonia.

Q. Was refrigeration available that Saturday?

A. Yes.

. . . .

Q. Have you ever assigned a task to your mechanics that you did not think they were qualified to do?

A. No.

Q. At any time did Brian Blue or Clifton Swain express to you any concerns about doing this project?

A. No, no.

. . . .

Q. Would you have -- you actually went into the room where Brian Blue was [sic] Clifton Swain were in there. Would you have gone into that room and exposed yourself to potential ---

A. No.

Q. --- bodily injury or death if you thought ---

A. No.

Q. --- there was exposure?

A. No.

Nor has Plaintiff shown that Mountaire Farms' managerial personnel had any basis for believing that any attempt by its mechanics to replace the votator sleeve was substantially certain to result in serious injury or death. While there was an internal discussion as to whether Mountaire Farms should hire an independent contractor to perform the installation, the mere fact that such a discussion took place, without more, falls short of meeting the "substantial certainty" element of *Woodson*.

Notably, the only evidence on this issue established that this was the first time Mountaire Farms had been required to address the need for repair of a votator. Ondona testified on this issue as follows:

> Q. Okay. When the votators were installed, how many votators were there?
>
> A. I think three.
>
> . . . .
>
> Q. Okay. During the time that you were engineering and maintenance manager for Mountaire Farms, was there a process or a procedure for performing major repairs on votators?
>
> A. We haven't [sic] done any repairs yet, so I could not recall initiating repair. And that's my recollection.

When asked why the possibility of using independent contractors for the project had been discussed, Ondona responded that this was "[b]ecause it was never done before by the plant, and it's the first time that we are going to undertake that kind of job. . . ."

Therefore, there were no past experiences upon which the Mountaire Defendants could have drawn in determining how to handle the installation of the new votator sleeve. Moreover, the evidence suggests that the votator sleeve *could*, in fact, have been safely installed by Mountaire Farms' employees had the ammonia been drained from the votator — presumably by a mechanic with the refrigeration department — prior to Swain beginning the installation.

However, there is no evidence that at any time after being assigned the project Swain requested assistance from the refrigeration department in draining the ammonia from the votator. Nor did he or Plaintiff ask Branton or any other supervisor to arrange for such assistance. Plaintiff also did not alert any of the refrigeration mechanics about his belief that they needed to assist Swain on this project. Plaintiff testified as follows regarding the issue of whether refrigeration mechanics could have provided assistance:

> Q. Could Mr. Swain that morning have had refrigeration drain the system?
>
> MR. LINETT: Objection to form.
>
> A. That was the supervisor's call. We don't have the

authority to tell no supervisor what to do.

Q. But refrigeration personnel were there at the plant that day?

A. Yes, ma'am.

Q. And they could have drained the system?

A. Yes, ma'am.

> MR. LINETT: Objection to form.

A. Excuse me.

Q. Could Mr. Swain have asked his supervisor to have refrigeration drain the system?

> MR. LINETT: Objection to form.

A. I guess he could have, yes.

Q. And could he have talked to his supervisor about this task?

> MR. LINETT: Objection to form.

A. Yes.

To the extent that Mountaire Farms' manner of handling and staffing the project can be characterized as negligent, this Court — as noted above — has made clear that "*[w]illful and wanton negligence alone is not enough to establish a Woodson claim*; a higher degree of negligence is required. The conduct must be so egregious as to be tantamount to an intentional tort." *Shaw*, 225 N.C. App. at 101, 737 S.E.2d at 176 (citation omitted). Similarly, the mere fact that additional safety measures

should — in hindsight — have been implemented is not enough to establish that the Mountaire Defendants intentionally engaged in conduct that they knew was substantially certain to cause serious injury or death to their employees. *See Edwards*, 193 N.C. App. at 585, 668 S.E.2d at 118 ("Although plaintiff contends that [the employer] could have done more to ensure its workers' safety, the evidence does not show that the employer engaged in misconduct *knowing* it was substantially certain to cause death or serious injury." (citation, quotation marks, and brackets omitted)).

We likewise reject Plaintiff's contention that the existence of prior DAQ and OSHA violations demonstrates egregious conduct by Mountaire Farms in terms of allowing the plant to operate in a state of noncompliance with applicable safety regulations. "While OSHA violations are not determinative, they are a factor in determining whether a *Woodson* claim has been established." *Kelly v. Parkdale Mills, Inc.*, 121 N.C. App. 758, 761, 468 S.E.2d 458, 460 (1996) (internal citation omitted). In the present case, prior to the 20 June 2009 accident, Mountaire Farms had been cited a total of three times — twice by OSHA and once by the DAQ. Notably, none of these violations related to the storage or release of ammonia.

On a number of occasions, North Carolina courts have rejected *Woodson* claims despite the presence of evidence in the record demonstrating that the workplace at issue was unsafe at the time of the accident. *See Pendergrass v. Card Care, Inc.*, 333

N.C. 233, 238, 424 S.E.2d 391, 394 (1993) (employer "knew that certain dangerous parts of . . . machine were unguarded, in violation of OSHA regulations and industry standards"); *Hamby*, 197 N.C. App. at 108, 676 S.E.2d at 600 ("Plaintiffs' forecast of evidence here shows that Hamby was injured by [the employer's] inadequately guarded machinery — the rotating augers — in violation of OSHA standards."); *Edwards*, 193 N.C. App. at 584, 668 S.E.2d at 118 ("[A]lthough the evidence tended to show that [the employer] did not adequately maintain its equipment, even a knowing failure to provide adequate safety equipment in violation of OSHA regulations does not give rise to liability under *Woodson*." (citation, quotation marks, brackets, and ellipses omitted)); *Regan v. Amerimark Bldg. Products, Inc.*, 127 N.C. App. 225, 226, 489 S.E.2d 421, 423 (1997) (three months before plaintiff's accident, employer was issued citations for "several serious violations of the Occupational Safety and Health Act"), *aff'd per curiam*, 347 N.C. 665, 496 S.E.2d 378 (1998).

For all of these reasons, we hold that Plaintiff has failed to show the existence of a genuine issue of material fact as to his *Woodson* claim and that the Mountaire Farms Defendants were entitled to judgment as a matter of law. The trial court therefore erred in denying the Mountaire Defendants' motion for summary judgment as to this claim.

**III. *Pleasant* Claims**

The Individual Defendants argue that the trial court also erred in denying their motion for summary judgment as to Plaintiff's *Pleasant* claims. Once again, we agree.

In *Pleasant*, the plaintiff and his co-worker were both employees of a construction company. One afternoon, the plaintiff was walking back from lunch to the construction site. The co-worker, who was driving his truck at the time, saw the plaintiff walking and decided to "scare [him] by blowing the horn and by operating the truck close to him." He drove too close to the plaintiff, hitting him with the truck and seriously injuring his right knee. *Pleasant*, 312 N.C. at 711, 325 S.E.2d at 246.

The plaintiff filed a personal injury action against the co-worker, who argued that the suit was barred by the exclusivity provision of the Workers' Compensation Act. *Id.* The trial court entered a directed verdict in favor of the co-worker, and a divided panel of this Court affirmed. *Pleasant v. Johnson*, 69 N.C. App. 538, 317 S.E.2d 104 (1984), *rev'd*, 312 N.C. 710, 325 S.E.2d 244 (1985).

Our Supreme Court reversed, holding that "[t]he pivotal issue in this case is whether the North Carolina Workers' Compensation Act provides the exclusive remedy when an employee is injured in the course of his employment by the willful, wanton and reckless conduct of a co-employee. We hold that it does not and that an employee may bring an action against the co-employee for injuries received as a result of such conduct." *Pleasant*, 312 N.C. at 710-11, 325 S.E.2d at 246.

In applying *Pleasant*, we have held that

> [e]ngaging in willful, wanton, and reckless behavior is akin to the commission of an intentional tort, and, as such, the employee must form the constructive intent to injure. Such intent exists where conduct threatens the safety of others and is so reckless or manifestly indifferent to the consequences that a finding of willfulness and wantonness equivalent in spirit to actual intent is justified. Alternatively, when an employee is injured by the ordinary negligence of a co-employee, the Act is the exclusive remedy.

*Pender v. Lambert*, 225 N.C. App. 390, 395, 737 S.E.2d 778, 782 (internal citations and quotation marks omitted), *disc. review denied*, 366 N.C. 591, 743 S.E.2d 197 (2013); *see also Trivette v. Yount*, 366 N.C. 303, 312, 735 S.E.2d 306, 312 (2012) ("[E]ven unquestionably negligent behavior rarely meets the high standard of 'willful, wanton and reckless' negligence established in *Pleasant*.").

The caselaw from this Court and the Supreme Court applying *Pleasant* illustrates the high bar that a plaintiff must meet in order to survive summary judgment on a *Pleasant* claim. *See, e.g., Jones v. Willamette Indus., Inc.*, 120 N.C. App. 591, 596, 463 S.E.2d 294, 297-98 (1995) (holding *Pleasant* claim not established where employee died while cleaning residue from boiler system at employer's plant in unsafe manner in accordance with co-workers' instructions because "although supervisory personnel at [employer] should have ensured that adequate and appropriate safety measures were in place, and being used . . . this does not support an inference that they intended for [the decedent] to be injured, nor does it support

an inference that they were manifestly indifferent to the consequences"), *disc. review denied*, 342 N.C. 656, 467 S.E.2d 714 (1996); *Dunleavy v. Yates Const. Co., Inc.*, 106 N.C. App. 146, 156, 416 S.E.2d 193, 199 (*Pleasant* claim not established where co-worker supervising inexperienced employee left employee unsupervised for brief period of time during which employee died as a result of trench collapse because "evidence show[ed] that [the co-worker's] conduct, although arguably negligent, was not willful, wanton, and reckless"), *disc. review denied*, 332 N.C. 343, 421 S.E.2d 146 (1992).

We first address Plaintiff's *Pleasant* claim against Branton, the supervisor at Mountaire Farms most directly involved in the assignment of the votator sleeve project. As discussed above in our analysis of Plaintiff's *Woodson* claim, the record is devoid of evidence that Branton was aware of the dangers involved with the installation of the votator sleeve. Indeed, Branton's lack of knowledge on this subject was most fundamentally demonstrated by the fact that he stood close enough to the votator during the attempted installation so that when the ammonia was released he — like Plaintiff — was seriously injured. It logically follows that he could not have formed the constructive intent to expose Plaintiff to a hazardous situation as would be necessary in order for a viable *Pleasant* claim to exist on these facts. Moreover, as discussed earlier, Branton was not responsible for Plaintiff's presence in the room where the installation was being performed.

Plaintiff's *Pleasant* claims against Garroutte, Ondona, and Smith are premised on his assertion that in their roles as managerial employees of Mountaire Farms they failed to recognize that the votator sleeve needed to be installed by an independent contractor as opposed to a Mountaire Farms' employee. However, as discussed above, the record fails to support Plaintiff's argument that Mountaire Farms employees were clearly incapable of replacing the votator sleeve. Moreover, even assuming *arguendo* that these Defendants were mistaken in their belief that the project could be safely performed by their own employees, there is no indication in the record that the need to utilize independent contractors was so obvious that a contrary decision amounted to the sort of willful, wanton, and reckless conduct required to support a *Pleasant* claim.

Plaintiff also alleges that Ondona failed to keep Mountaire Farms' risk management plan up to date and that Saufley should be held liable because he possessed "responsibility for general employee safety." However, such assertions — without more — are insufficient to establish a valid *Pleasant* claim. *See Jones*, 120 N.C. App. at 596, 463 S.E.2d at 297-98 ("[A]lthough supervisory personnel . . . should have ensured that adequate and appropriate safety measures were in place, and being used . . . this does not support an inference that they intended for [the decedent] to be injured, nor does it support an inference that they were manifestly indifferent to the consequences.").

Finally, summary judgment is also proper as to Plaintiff's *Pleasant* claim against Swain. Swain's lack of understanding that the ammonia had to be drained from the votator prior to the installation of the new votator sleeve and his failure to take the necessary safety precautions were mistakes on his part that tragically ended up costing him his life. Such errors simply do not amount to the sort of willful, wanton, and reckless conduct between co-workers that lies at the heart of a *Pleasant* claim.

Thus, we hold that Plaintiff failed to forecast sufficient evidence in support of his *Pleasant* claims to defeat the Individual Defendants' motion for summary judgment. Therefore, the trial court erred in denying their motion.

**Conclusion**

For the reasons stated above, the trial court's denial of Defendants' motion for summary judgment is reversed. We remand this case to the trial court with instructions to enter summary judgment in favor of Defendants on all claims asserted by Plaintiff in this action. Plaintiff's cross-appeal is dismissed as moot.

REVERSED AND REMANDED IN PART; DISMISSED IN PART

Chief Judge McGEE and Judge DILLON concur.